# UNITED STATES COURT OF INTERNATIONAL TRADE

# BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

—————————————————————————x
:
ZHEJIANG DINGLI MACHINERY
CO., LTD.,                  :
:
          *Plaintiff*,     :    Court No. 24-221
:
v.                      :
:
UNITED STATES,       :
:
          *Defendant*,   :
:
and                  :
:
COALITION OF AMERICAN     :
MANUFACTURERS OF MOBILE   :
ACCESS EQUIPMENT       :
:
    *Defendant-Intervenor*.  :
—————————————————————————x

## PLAINTIFF'S REPLY BRIEF

Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

*599 Lexington Ave., 36th Floor
New York, New York 10022

-and-
1201 New York Avenue, Ste. 650
Washington, D.C. 20005

*Counsel for Plaintiff Zhejiang*
*Dingli Machinery Co., Ltd.*

Dated: June 25, 2026

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

ARGUMENT........................................................................................2

I.  Commerce Unlawfully Selected Türkiye as the Primary SC ..........2

A.  The Government Misstates Commerce's Legal Framework for SV and SC Selection and this Court's Standard of Review ......3

B.  The Government Fails to Establish that Turkish Import Data Are Undistorted By Hyperinflation...........................................6

II.  Commerce Unlawfully Selected Turkish Financial Statements For Calculating Ratios ...........................................................................10

III. Commerce Unlawully Rejected Bulgaria As The Primary SC......18

IV. Commerce Unlawfully Used The Cohen's $d$ Test In Its differential Pricing Analysis.............................................................................23

V.  Commerce Unlawfully Deducted Section 301 Duties From Dingli's U.S. Sales Price .............................................................................25

CONCLUSION .................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Algoma Steel Corp. v. United States,*
  865 F.2d 240 (Fed. Cir. 1989) ................................................................ 26

*Allied Pacific Food (Dalian) Co. v. United States,*
  435 F. Supp. 2d 1295 (CIT 2006) ............................................................. 5

*Best Mattresses Int'l Co. v. United States,*
  622 F. Supp. 3d 1347 (CIT 2023) ........................................................... 25

*Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States,*
  63 F.4th 25 (Fed. Cir. 2023) ........................................................... 26, 27

*Calgon Carbon Corp. v. United States,*
  145 F. Supp. 3d 1312 (CIT 2016) ........................................................... 13

*Catfish Farmers of Am. v. United States,*
  37 CIT 1001 (2013) ................................................................................. 13

*Chevron, U.S.A., Inc. v. NRDC, Inc,*
  467 U.S. 837 (1984) ................................................................................... 4

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States,*
  813 F. Supp. 3d 1319 (CIT 2025) ........................................................... 15

*Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States,*
  794 F. Supp. 3d 1334 (CIT 2025) ............................................................. 4

*Jiaxing Bro. Fastener Co. v. United States,*
  822 F.3d 1289 (Fed. Cir. 2016) ................................................................ 4

*Jinko Solar Imp. & Exp. Co. v. United States,*
  701 F. Supp. 3d 1367 (CIT 2024) ........................................................... 26

*Loper Bright Enter. v. Raimondo,*
603 U.S. 369 (2024) ....................................................................... 4

*Marmen Inc. v. United States,*
134 F.4th 1334 (Fed. Cir. 2025)...................................................24

*Neimenggu Fufeng Biotechnologies Co. v. United States,*
741 F. Supp. 3d 1354 (CIT 2024).............................................25, 26

*PSC VSMPO-AVISMA Corp. v. United States,*
33 CIT 1593 (2009)..................................................................... 15

*Shanghai Tainai Bearing Co. v. United States.*
658 F. Supp. 3d 1269 (CIT 2023)..........................................26, 27, 28

*Shenzhen Xinboda Indus. Co. v. United States,*
976 F. Supp. 2d 1333 (CIT 2014).................................................17

*Stratoflex, Inc. v. Aeroquip Corp.,*
713 F.2d 1530 (Fed. Cir. 1983) ...................................................25

*Taian Ziyang Food Co. v. United States*
35 CIT 863 (2011)...................................................................... 15

*Wheatland Tube Co. v. United States,*
495 F.3d 1355 (Fed. Cir. 2007) .............................................25, 27

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
716 F.3d 1370 (Fed. Cir. 2013) .............................................16, 28

**Rules**

Fed. Rule Evid. 201 ....................................................................... 13

**Statutes**

19 U.S.C. § 1673...........................................................................27

19 U.S.C. § 1677......................................................................6, 25

iii

**Other Authorities**

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023,* 89 Fed. Reg. 88,730 (Nov. 8, 2024) ................................................. passim

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 20,401 (Apr. 16, 2026) ........................................... 11, 12, 14

*Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 53,449 (Oct. 23, 2018) ...............20-21

## GLOSSARY OF ABBREVIATIONS

ADD:        Antidumping Duty

AR1:        First Administrative Review

AR2:        Second Administrative Review

AUV:        Average Unit Value

BITT:       Exemptions on Banking and Insurance Transaction Tax

CAFC:       U.S. Court of Appeals for the Federal Circuit

CPI:        Consumer Price Index

ETFET:      Exemptions on Exchange Tax for Foreign Exchange
            Transactions

IDM:        Issues & Decision Memorandum

IMF:        International Monetary Fund

MAE:        Mobile Access Equipment and Subassemblies Thereof

NV:         Normal Value

PMS:        Particular Market Situation

PPI:        Producer Price Index

SC:         Surrogate Country

SV:         Surrogate Value

TDM:        Trade Data Monitor

TLR:        Turkish Lira

USD:        U.S. Dollar

## INTRODUCTION

Plaintiff Zhejiang Dingli Machinery Co., Ltd. ("Dingli") replies to the Response Briefs filed by Defendant United States ("Government"), on March 4, 2026, 2026, ECF 40 ("Gov. Br.") and, by Defendant-Intervenor Coalition of American Manufacturers of Mobile Access Equipment ("Coalition"), on April 23, 2026, ECF 43 ("Def.-Int. Br."), in opposition to Plaintiff's Corrected Motion for Judgement Upon the Agency Record filed on August 12, 2025, ECF 34 ("Pl. Br."). In its Opening Brief, Dingli established that the U.S. Department of Commerce ("Commerce" or "Department") in its first administrative review ("AR1") of the antidumping duty ("ADD") order on certain mobile access equipment and subassemblies thereof ("MAE") from the People's Republic of China ("China"), unlawfully calculated Dingli's surrogate values ("SV"), used the Cohen's $d$ test in its differential pricing analysis, and deducted Section 301 duties from Dingli's U.S. sales price. *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023,* 89 Fed. Reg. 88,730 (Nov. 8, 2024), PR 298 ("*Final Results*"), Issues and Decision Memorandum (Nov. 4, 2024), PR 294

1

("IDM")

Commerce's *Final Results* are not rehabilitated by the

Government and Coalition Response Briefs because, as discussed in

Dingli's Opening Brief and below, Commerce unlawfully:

1. selected Türkiye as the primary surrogate country ("SC") over Bulgaria, even though Turkish data is distorted by hyperinflation and countervailable subsidies;

2. selected Turkish financial statements that were not adjusted for hyperinflation and contained evidence of countervailable subsidies over superior Bulgarian financial statements for use in calculating surrogate financial ratios;

3. rejected Bulgaria as the primary surrogate country, despite the fact that Bulgaria provided the best SV data available;

4. used the Cohen's $d$ test in its differential pricing analysis; and,

5. incorrectly categorized Section 301 duties as "United States Import Duties" and deducted them from Dingli's U.S. sales price.

## ARGUMENT

I. **COMMERCE UNLAWFULLY SELECTED TÜRKIYE AS THE PRIMARY SC**

In its Opening Brief, Dingli established that Commerce unlawfully

selected Türkiye instead of Bulgaria as the primary SC. Pl. Br. at 12-33.

Specifically, Dingli demonstrated that Turkish SV data and financial

2

statements are severely distorted by hyperinflation, rendering them unreliable and therefore unusable, while Bulgaria provides SVs and financial statements that are undistorted by hyperinflation. *Id.* at 13. Dingli established that the statutory "best available information" criteria supported Bulgaria as the superior choice for the primary surrogate country. In response, the Government and Coalition unpersuasively argue that Commerce lawfully and reasonably preferred Türkiye over Bulgaria as its primary surrogate country choice. Gov. Br. at 21-35; Def.-Int. Br. at 5-7. As set forth below, these arguments are neither supported by substantial evidence nor in accordance with law.

## A. The Government Misstates Commerce's Legal Framework for SV and SC Selection and this Court's Standard of Review

First, the Government claims that "Dingli's arguments misstate the governing legal standard." Gov. Br. at 21. The Government argues that "because the statute is silent regarding what constitutes the 'best available information,' Commerce possesses 'broad discretion' in deciding what record evidence meets the criteria." *Id.* at 23. The Government further argues that Commerce "is not required to prove that its selection is flawless as long as a 'reasonable mind could

3

conclude that Commerce chose best available information.'" *Id.* at 26

(quoting *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1301

(Fed. Cir. 2016)). The Government's position as to the proper legal

standard governing Commerce's SC and SV selection, and the

corresponding standard of review applied by this Court, is contrary to

*Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 369-70, (2024) that

overruled *Chevron, U.S.A., Inc. v. NRDC, Inc*, 467 U.S. 837 (1984). Pl.

Br. at 4. As Dingli established, *Loper* forecloses this Court from

affirming Commerce's decision merely upon finding that the

government's statutory interpretation is "reasonable." Instead, post-

*Loper*, for SV and SC selections, Commerce's statutory guidepost "'best

available information' means that which is better than all other

information available" – rather than merely a reasonable choice.

*Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*, 794

F. Supp. 3d 1334, 1342 (CIT 2025), which relied on *Loper*).

   Second, the Government misleadingly asserts that "Commerce

may rely on 'imperfect' data" Gov. Br. at 24 (quoting *Jiaxing Bro.*, 822

F.3d at 1301). This pronouncement overlooks the judicially mandated

requirement that when datasets from competing SCs are imperfect,

4

Commerce must "conduct a fair comparison of the data sets on the record." *Allied Pacific Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295, 1313-14 (CIT 2006). The Government also argues that "the statute does not compel Commerce to elevate a single alleged risk factor (*e.g.*, inflation) above all others or to reject a surrogate country absent record evidence that the surrogate data used are actually distorted." Gov. Br. at 26. As Dingli demonstrates below, the 2022 data reported in Turkish financial statements used in the *Final Results* are **<u>actually distorted by hyperinflation</u>**, which, in turn, triggered their adjustment in the subsequently published 2023 financial statements. Section II, *infra.*

As such, contrary to the Government's assertion, Turkish hyperinflation is the single most important consideration on this record in the choice of primary SC. By contrast, the alleged "record-based limitations of Bulgaria's dataset (movement inflators and unusable financial statements)" Gov. Br. at 27, are significantly less important. Moreover, as Dingli demonstrates below, the record does contain Bulgarian producer price index ("PPI") data, which can be applied to inflate Bulgarian movement expenses. Section III, *infra.* This fact, in

5

turn, eliminates one of the two reasons Commerce relied upon to reject the choice of Bulgaria.

Therefore, Bulgaria, instead of Türkiye, provides the best available information based on two additional critical facts: (1) the proven distortion of Turkish financial statements' 2022 data; and (2) the availability of Bulgarian PPI data. Accordingly, the statutory "best available information" standard impeaches Türkiye in favor of Bulgaria as the best primary SC choice. 19 U.S.C. § 1677b(c)(1)(B).

### B.    The Government Fails to Establish that Turkish Import Data Are Undistorted By Hyperinflation

The Government asserts that "Commerce reasonably found no record evidence that the Turkish average unit values were distorted by hyperinflation." Gov. Br. at 27-31; s*ee* Def-Int. Br. at 5. As discussed below, this argument is unsupported by substantial record evidence.

First, the Government reasons that SVs "used to value Dingli's factors of production ("FOP") were denominated in euros, and the record did not establish that euro-denominated import prices were distorted" by "domestic inflation conditions." *Id*. at 28-29. However, this reasoning is impeached by Trade Data Monitor ('TDM') Türkiye import data that *are officially reported in Turkish Lira*. Pl. Br. at 24. The Government,

6

like Commerce, errs by conflating the <u>denomination</u> in Euro of Turkish imports with their <u>trading / settlement</u> in Euro. Euro denomination of import data is obtained merely through an arithmetical step of currency conversion – Turkish Lira ("TLR") to Euro – since GTA (or TDM) permit data downloads in any currency. Pl. Br. at 25. In contrast, trading / settlement of imports in Euro mean that the actual transaction and payment for imports were consummated in Euro. As such, mere denomination in Euro of Turkish import data – where the underlying imports were predominantly traded / settled in TLR (as discussed below) – fails to support the Government's defense against Dingli's demonstration of distortion through hyperinflation.

Moreover, the Government undercuts itself when conceding that "the record did not establish 'in which specific currency' the preponderance of the relevant imports were actually traded and settled." Gov. Br. at 28-29 (quoting IDM at 9, Appx____). Conversely, as Dingli demonstrated, the Turkish government's de-dollarization campaign strongly suggests that the majority of Turkish period of review ("POR") imports were denominated as well as traded /settled in hyperinflation-distorted TLR, rather than Euro. Pl. Br. at 25. Further,

7

Dingli already established the distortive impact of domestic hyperinflation on the import data due to a dynamic equilibrium between domestic and import prices. *Id*. at 32.

Second, the Government incorrectly claims that there is no record evidence "demonstrating that Turkish import average unit values (AUVs) measured in euros were overstated or unreliable due to exchange-rate conditions." Gov. Br. at 29. This claim ignores the issue as to how Turkish import AUVs in Euro could be held reliable given that the 30% depreciation of the government-controlled TLR-U.S. Dollar ("USD") exchange rate (and, by extension TLR-Euro exchange rate) significantly lagged even the understated official 58% Consumer Price Index ("CPI"') inflation. Pl. Br. at 27. Moreover, neither the Government nor Commerce addressed the *inherent asymmetry* underlying Commerce's methodology of calculating normal value ("NV") in USD. This calculation is based on applying the currency conversion exchange rate for a <u>particular day</u> (*i.e.*, the date of sale) to the underlying NV (whether in TLR or Euro), whereas the NV is obtained by aggregating the FOP of inputs multiplied by their respective SVs, which are based on imports for the <u>entire POR</u> in a hyperinflationary economy. Pl. Br. at

28. As Dingli established, this asymmetric formula automatically results in a skewed equivalent NV. *Id.* at 28.

Third, the Government argues that "Commerce reasonably rejected Dingli's reliance on the Canadian government's particular market situation {'PMS'} findings concerning Turkish rebar" Gov. Br. at 30. It then attempts to quarantine the PMS-distorted prices of Russian-origin steel billet and scrap in the Turkish domestic market from the pricing of imported steel products in Türkiye. *Id.* at 30-31. This attempt fails because "the distortive influence of Russian steel billet pricing permeate{d} through the entire Turkish domestic market steel sector and consequently distort{ed} prices of exports and imports of steel products." IDM at 11, Appx____. Further, the Government fails to address Dingli's demonstration that because steel scrap and steel billet are inputs used to produce secondary steel products, which are utilized to produce MAE, the distorted prices of steel scrap / billet distorts secondary steel input pricing in the Turkish domestic market. Pl. Br. at 32. In turn, given the dynamic equilibrium between domestic and import prices, Turkish import prices of all primary and secondary steel

9

inputs likewise are distorted. *Id*. Thus, the Government's arguments are without merit and should be rejected.

Finally, record evidence contradicts the Government 's argument that "Dingli failed to demonstrate that the euro-denominated Turkish import average unit values used in this review were aberrational or unreliable." Gov. Br. at 31. In fact, the record contains evidence submitted by Dingli establishing that during the POR, steel prices trended up in Türkiye while trending down in other global markets, thereby confirming that hyperinflation distorted Turkish prices. Pl. Br. at 30, Attachment 1. This fact, in turn, impeaches the reliability of the stagnant Euro denominated steel prices reported by the Turkish government. *Id*. at 30. Therefore, contrary to the Government's assertion, Gov. Br. at 31, Commerce acted unreasonably in declining to disqualify Türkiye as a SC because of hyperinflation.

## II. COMMERCE UNLAWFULLY SELECTED TURKISH FINANCIAL STATEMENTS FOR CALCULATING RATIOS

In its Opening Brief, Dingli established that Turkish financial statements are distorted by hyperinflation and countervailable subsidies. Pl. Br. at 33-55. The Government counters that "Commerce reasonably relied on Turkish financial statements." Gov. Br. at 31-35.

10

As set forth below, the Government's arguments are unsupported by substantial record evidence and directly impeached by the subsequent final results of the second administrative review ("AR2") of the ADD order on MAE from China. *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 20,401 (Apr. 16, 2026) ("*AR2 Final Results*").

First, the Government unpersuasively responds to Dingli's demonstration that the expenses and revenue of Turkish companies Tümosan Motor ve Traktör Sanayi A.Ş. ("Tumosan") and Türk Traktör Ve Ziraat Makineleri A.Ş. ("Turk Traktor") are distorted because they were not adjusted for hyperinflation. Pl. Br. at 34-42. The Government's retort is that "the relevant inquiry is not whether alternative accounting treatments or inflation adjustments could exist in the abstract, but whether the financial statements on the record are sufficiently reliable and usable to calculate surrogate ratios." Gov. Br. at 34. As discussed below, the 2022 data as reported in Tumosan and Turk Traktor's 2022 financial statements, and used in the *Final Results* for surrogate financial ratio calculations, are **distorted in fact**, and not

11

merely in the abstract.

The Government argues that "Commerce . . . addressed Dingli's argument that hyperinflation rendered the Turkish financial statements unreliable." *Id.* at 34 (citing IDM at 13-16, Appx____-____). The Coalition asserts that "Commerce found no record evidence contradicting the Turkish accounting and auditing standards authority's determination that it was unnecessary to adjust for inflation during the relevant period." Def-Int. Br. at 5-6 (citing IDM Comment 2, Appx____-____).

In fact, non-adjustment for hyperinflation of the 2022 data reported in the 2022 Turkish financial statements was a determinative factor in Commerce's selection of these statements in the *Final Results.* IDM Comment 5, Appx____-____. However, the administrative record of the recently issued *AR2 Final Results* confirms that the initially reported 2022 data in the 2022 financial statements of Tumosan and Turk Traktor were subsequently adjusted to account for hyperinflation in both companies' 2023 financial statements. 91 Fed. Reg. 20,401, IDM at 29.

We acknowledge that the AR2 record documents are not on the

AR1 record. However, this Court has in the past, and should in this case, take judicial notice of documents in other Commerce ADD proceedings that are publicly available on ACCESS. *See Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327 (CIT 2016). The propriety of taking such judicial is especially heightened when it is based on an identical issue in a subsequent segment of the same proceeding. *See Catfish Farmers of Am. v. United States*, 37 CIT 1001, 1383 (2013).

Commerce's AR2 record documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. Rule Evid. 201(b)(2). This Court should, in particular, take judicial notice of the following AR2 submissions:

- 2023 Tumosan and Turk Traktor financial statements of reporting data for the previous year, 2022. Coalition AR2 First SV Submission (Dec. 16, 2024), Exhibits 15-B-4 & 15-E-4, ACCESS Barcodes 4682634-02 & 4682634-03; and

- Dingli AR2 Rebuttal Brief (Feb. 24, 2026), ACCESS Barcode 4884584-01, at ii-iii, 7-8, 111-35, demonstrating that the 2022 data as reported in 2023 financial statements are different (on account of hyperinflation adjustment) from the 2022 data reported in 2022 financial statements of both Tumosan and Turk Traktor.

Commerce's summary in its AR2 IDM of Dingli's position reveals

13

discrepancies between the 2022 data used for financial ratio calculations in the AR1 *Final Results* and those companies' 2022 data as reported in their 2023 financial statements:

> Moreover, there are discrepancies between the cost category for 2022 as reported in Tumosan's 2022 financial ratio calculation in {the *Final Results AR1*} and its 2023 financial statement. These discrepancies raise serious concerns about the overall reliability of Tumosan's 2023 financial data.
>
> Moreover, there are discrepancies between the cost category for 2022 as reported Turk Traktor's 2022 financial ratio calculation in {the *Final Results AR1*} and its 2023 financial statement. These discrepancies raise serious concerns about the overall reliability of Turk Traktor's 2023 financial data.

*AR2 Final Results*, 91 Fed. Reg. 20,401, IDM at 29.

Through comparison of the 2023 and 2022 financial statements of both companies, the necessary adjustment becomes apparent between the initially reported 2022 data (in the 2022 statements) and the subsequently reported 2022 data (in the 2023 statements), noted by Commerce in the *AR2 Finals Results*. In turn, the subsequent hyperinflation-adjustment of the initially reported 2022 revenue and expense data in Tumosan and Turk Traktor's 2022 statements along with revision of certain cost categories constitute substantial evidence that the 2022 data used for ratio calculations are distorted and

14

unreliable. Therefore, Commerce's selection of 2022 Turkish financial statements are contradicted by substantial record evidence and not in accordance with law.

Dingli requests that this Court order remand and require that Commerce reopen the record to analyze the impact of the revised 2022 data on its selection of financial statements, as this Court has repeatedly required. *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 813 F. Supp. 3d 1319, 1327 (CIT 2025); *Taian Ziyang Food Co. v. United States*, 35 CIT 863, 910 (2011); *PSC VSMPO-AVISMA Corp. v. United States*, 33 CIT 1593, 1602 (2009). Such action is warranted so thar the AR1 record includes the 2023 financial statements, with revised 2022 data, currently on the record in AR2. Accuracy concerns trump finality concerns in this case, since the 2022 data on the record is undeniably no longer accurate (*i.e.*, it has been adjusted) and the changes to the financial statements were made after the AR1 record closed.

On remand, Commerce should explain its choice of the 2022 data reported in the 2022 financial statements of Tumosan and Turk Traktor, in light of the fact that these data were subsequently adjusted

15

by both companies because of hyperinflation. Indeed, using impugned surrogate financial data would contradict the "overriding purpose of Commerce's administration of {ADD} laws . . . to calculate dumping margins as accurate as possible." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013).

Second, the Government fails to overcome Dingli's demonstration that Tumosan's financial statement is suspected to be distorted by countervailable subsidies. Pl. Br. at 42. The Government counters that "Dingli failed to provide any affirmative evidence in the financial statements that the Turkish companies actually benefitted from any countervailable subsidy." Gov. Br. at 35. However, unrebutted record evidence establishes that Tumosan's 2022 financial statement is potentially distorted by two countervailable subsidy programs – Exemptions on Exchange Tax for Foreign Exchange Transactions ("ETFET") and Exemptions on Banking and Insurance Transaction Tax ("BITT"). Pl. Br. at 44; Dingli Final SV Submission (Mar. 27, 2024), PR 213-20, Exhibit TR-10C, Appx____-_____ (Annex 2 page 115 showing Tumoson's name and its registry certificate No. 538690, Appx____).

16

Dingli demonstrated that independent evidence external from Tumosan's financial statement established that ETFET and BITT subsidy programs existed during the POR and that Tumosan – as a member of three exporter's associations and holder of an industrial registry certificate – was eligible to receive those subsidy benefits. *Id.* at 45. This fact, in turn, constitutes substantial evidence that Tumosan is suspected to have received countervailable subsidies benefits during 2022. The Government's imposition of a stringent requirement of direct evidence of receipt of subsidy amount within Tumosan's financial statement is at odds with the liberal statutory standard of "reason to suspect." Pl. Br. at 42-46.  This standard requires that Commerce review the entire record in order to establish whether a financial statement could be suspected to be distorted by countervailable subsidies. *Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333, 1368, 1374 (CIT 2014); Pl. Br. at 43-44.

In sum, contrary to the Government's arguments, Commerce's selection of Tumosan and Turk Traktor is unreasonable and unsupported by record evidence. This fact, in turn, impeaches Commerce's selection of Türkiye as the primary SC.

## III. COMMERCE UNLAWULLY REJECTED BULGARIA AS THE PRIMARY SC

In its Opening Brief, Dingli established that Commerce's disjunctive analysis improperly rejected Bulgaria based on deficiencies that are minor relative to the unreliability of Turkish data. Pl. Br. at 47-55. The Government defends the rejection of Bulgaria, claiming that Commerce "identified the specific, record-based limitations of Bulgaria's dataset (movement inflators and unusable financial statements)." Gov. Br. at 27. As set forth below, the Government's arguments are unsupported by substantial record evidence.

First, with regard to the Bulgarian PPI inflator for movement expenses, the PPI inflator data is indeed on the record. Dingli Final SV Submission Exhibit TR-9C-1, Tabs: "Bulgaria Total PPI"; "Bulgaria Non Domestic," Appx____-____, Appx____-____.[1] This Court should order remand on the issue of the unreliability of Turkish 2022 financial statements, during which time Commerce can review the Bulgarian PPI

---

[1]    We acknowledge that these Bulgarian PPI data, published by the International Monetary Fund ("IMF"), were not noticed by Dingli or Commerce during AR2 administrative briefing on account of the voluminous SV record. Since the provenance of IMF PPI data cannot be disputed, Commerce should consider these data in remand proceedings.

18

data that contradict a critical reason why it rejected Bulgaria as the primary SC.

Second, the Government argues "that the Bulgarian financial statements proposed were incomplete or otherwise unusable for ratio calculation." Gov. Br. at 32-33. However, the Government defends Commerce's rejection of only one of the two Bulgarian financial statements, *i.e.*, that of Dimexlift Group AD ("Dimexlift"). *Id.* at 33. While conceding that Dimexlift is a "producer of comparable merchandise," the Government nonetheless claims that its financial statement is "'substantially less detailed,' consisting only of a balance sheet, an income statement, and a short director's report." *Id.* (quoting IDM at 22, Appx____). The Government harps on the Dimexlift financial statement missing "an 'Annex' containing explanatory notes," and asserts that its absence "result{s} in a 'rudimentary' calculation of financial ratios and risk{s} oversimplifications and inaccuracies relative to the ratios derived from the more complete Turkish statements." *Id.* (quoting IDM at 23, Appx____). As discussed below, the Government's arguments are unsupported by substantial record evidence.

19

In its Opening Brief, Dingli demonstrated that the rations calculated from Dimexlift's financial statements are reliable. Pl. Br. at 48. The Dimexlift statement breaks out expenses for all vital cost and expense categories, including raw materials, energy, labor, overheads, trading goods, and selling, general, and administrative expenses. Dingli Revised Case Brief (June 20, 2024), PR 280, CR 242, Appx____. As the Government fails to dispute this critical fact, its efforts to impeach the Dimexlift financial statement are unavailing.

Likewise, the Government impermissibly speculates that the "absence of explanatory notes" renders it unclear "whether Dimexlift's 'other revenue' reflected normal business operations and, if so, how that revenue should be treated for ratio purposes." Gov. Br. at 33 (quoting IDM at 23, Appx____). The Government, however, fails to identify any Dimexlift business, separate from its manufacturing activities, to which such "other revenue" could be attributed. The Government also fails to counter Dingli's proffered precedent establishing that "absent contrary evidence, Commerce's standard practice is to consider 'other income' as related to the 'general operations of the company.'" Pl. Br. at 50 (quoting *Steel Wire Garment Hangers from the People's Republic of*

20

*China: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 53,449 (Oct. 23, 2018), IDM Comment 1).

Therefore, the Government fails to support the reasons why Commerce rejected the Dimexlift financial statement.

Notably, neither the Government nor the Coalition attempt to impeach the other Bulgarian financial statement of Balkancar-Ruen AD ("Balkancar"). The record establishes that Balkancar is a producer of trucks and other lifting and transport equipment utilizing steel inputs, cylinders, etc., mirroring Dingli's production experience. Gov. Br. at 52-53; Dingli Final SV Submission Exhibit BG-11A, Annual Activity Report 2022 at 1, Appx____, Annex at 1, Appx____). Further, Balkancar's production of truck chassis units are comparable to MAE subassemblies. *Id.*, Balkancar Company Information, Plants at 3, Appx____. Balkancar's manufacture of "components . . . for forklift trucks, and off-highway machines used in the material handling, and agriculture markets" also are comparable to MAE subassemblies. *Id.*, Balkancar Product Information, at 1, 4, 8, Appx____, Appx____, Appx____.

21

Therefore, substantial evidence supports that Balkancar and Dingli have comparable production experiences and both the Government and the Coalition implicitly concede this issue.

Likewise, neither the Government nor the Coalition contest Dingli's demonstration that absence of an auditor's report in Balkancar's financial statement is not a deficiency, and should not have impeached its selection. Pl. Br. at 54. Balkancar was not required by the Bulgarian government to have its statement audited. IDM at 25-26, Appx____-____.

Accordingly, neither the Government nor the Coalition rehabilitate   Commerce's decision to reject the Bulgarian financial statements. That decision was not based on substantial record evidence and was contrary to established precedent. In contrast, as demonstrated above, both Turkish financial statements are incurably flawed and distorted by hyperinflation. Section II, *supra*.

In sum, this Court should find that the reasons why Commerce rejected Bulgarian financial statements are unlawful and unsupported by substantial evidence. When this defect in Commerce's rationale is coupled with Commerce's failure to properly consider the distortive

22

impact of hyperinflation on the Turkish financial statements, it is clear Commerce should have selected Bulgaria over Türkiye as the primary SC. Accordingly, this Court should find that Commerce's rejection of Bulgaria as the primary SC is unlawful and unsupported by substantial evidence.

## IV. COMMERCE UNLAWFULLY USED THE COHEN'S *d* TEST IN ITS DIFFERENTIAL PRICING ANALYSIS

In its Opening Brief, Dingli demonstrated that Commerce unlawfully applied its Cohen's *d* methodology. Pl. Br. at 55-56. In response, the Government and Defendant-Intervenor asks that this Court dismiss this Cause of Action by claiming that Dingli lacks standing to challenge Commerce's application of the Cohen's *d* test, claiming that "Dingli cannot point to any resulting injury that it has suffered." Gov. Br. at 56; Def.-Int. Br. at 7-13. Commerce plainly applied this methodology and found "that 77.8 percent of the value of U.S. sales pass the *Cohen's d* test, confirming the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods." U.S. Department of Commerce Memorandum (Nov. 4, 2024), CR 244, PR 195, at 3, Appx____. Dingli acknowledges that Commerce did thereafter:

determine that there is no meaningful difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test. Thus, for this final results, Commerce is applying the average-to-average method for all U.S. sales to calculate the weighted-average dumping margin for Dingli.

*Id.*, Appx____.

This Court should nonetheless decline to dismiss Dingli's differential pricing challenge because Commerce's flawed differential pricing analysis represents a barrier to any potential relief granted to Dingli. Defendant does not dispute that Commerce applied the same Cohen's *d* test to Dingli that has been recently invalidated by the U.S. Court of Appeals for the Federal Circuit ("CAFC"). *Marmen Inc. v. United States*, 134 F.4th 1334, 1348 (Fed. Cir. 2025). Continued application of the Cohen's *d* test upon remand could require additional rounds of briefing regarding an inflated ADD rate and would waste the resources of this Court and all parties to this proceeding. *See* Pl. Br. at 55-56. In the interests of judicial economy, accuracy, and to avoid unnecessary repetition and duplicative efforts, this Court should not

24

delay in remanding this issue to Commerce. *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983) ("The result being unchanged, a remand for reconsideration of the evidence would in this case constitute a waste of resources for the courts and the parties.").[2]

## V.   COMMERCE UNLAWFULLY DEDUCTED SECTION 301 DUTIES FROM DINGLI'S U.S. SALES PRICE

Dingli demonstrated that Commerce unlawfully deducted Section 301 duties from U.S. price, violating the statutory directive to deduct only normal "United States import duties," 19 U.S.C. § 1677a(c)(2)(A), not special duties, as Section 301 duties are; not indefinite and being revisited; and remedial with the objective of eliminating certain harmful Chinese government practices. Pl. Br. at 56-69. At issue is whether Section 301 duties are special duties, alongside ADD and Section 201 duties, subject to *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007)), or whether they are normal duties

---

[2]   Dingli respectfully disagrees with the contrary result ordered by Judge Katzmann of this Court in *Best Mattresses Int'l Co. v. United States*, 622 F. Supp. 3d 1347, 1368-69 (CIT 2023), and *Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp. 3d 1354, 1378 (CIT 2024). Dingli asks this Court to reconsider the analysis which led to those decisions.

such as Section 232 duties subject to *Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 63 F.4th 25, 35 (Fed. Cir. 2023). As set forth below, this Court should decline Defendants' invitations to extend *Borusan* and endorse *Shanghai Tainai Bearing Co. v. United States*. 658 F. Supp. 3d 1269, 1291-96 (CIT 2023), and the other rulings of this Court following *Shanghai Tainai*.[3] Gov. Br. at 61-67; Def.-Int. Br. at 13-21.

The CAFC decision affirming Commerce's action with respect to Section 232 duties—because they addressed the "national security . . . threat{} by the unsustainably low utilization of domestic steel-producing capacity"—is readily distinguishable from Section 301 duties. *Borusan*, 63 F.4th at 35. Like Section 201 duties, Section 301 duties serve a trade-related, remedial purpose. Pl. Br. at 61-62. Further, this Court should not follow *Shanghai Tainai*, which is not binding. *Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989). *Shanghai Tainai* affirmed Commerce's deduction of Section 301 duties by improperly extending *Borusan* despite Section 232 duties having the

---

[3]    This Court has followed *Shanghai Tainai* in *Neimenggu Fufeng*, 741 F. Supp. 3d at 1378, and *Jinko Solar Imp. & Exp. Co. v. United States*, 701 F. Supp. 3d 1367, 1392 (CIT 2024).

materially different purpose of safeguarding national security as contrasted with providing trade remedies instead. 658 F. Supp. 3d at 1293.

*Shanghai Tainai* also sidestepped analyzing Section 301 duties per the *Wheatland Tube* factors—whether ordinary or special, whether permanent or temporary—by relying on *Borusan*, which focused on Section 232 duties driven by national security concerns:

> *Borusan* instructs that it is the text of the legal order levying duties that is paramount; and it is unnecessary for a reviewing court to apply the *Wheatland Tube* factors where that text has spoken clearly. . . . **This principle, as elucidated in *Borusan*, extends beyond Section 232 duties and applies to other statutory duties.** . . . Here, "the particular exercise of the authority" to enact the Section 301 duties at issue intended for these duties to be additional to {ADD}.

*Id.* at 1294 (emphasis added).

Defendants attempt to extend *Borusan* to Section 301 duties is contrary to controlling law. For example, ADD is assessed pursuant to statutory language similar to that for imposing Section 301 duties. *See* 19 U.S.C. § 1673 ("there shall be imposed upon such merchandise an {ADD}, *in addition to any other duty* imposed") (emphasis added). Yet ADD is not deducted from the U.S. sale price, based on the purpose

27

underlying the imposition of such special duties (trade remedies) and effects of deducting them from the U.S. sale price (double-counting). Indeed, the CAFC instructs that, in determining ADD margins, "{f}orm should be disregarded for substance." *Bestpak*, 716 F.3d at 1378. Accordingly, this Court should not follow *Shanghai Tainai*.

## CONCLUSION

For the foregoing reasons, Dingli requests that this Court hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law and remand the *Final Results* with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

*599 Lexington Avenue., Fl. 36
New York, New York 10022
      -and-
1201 New York Avenue, N.W.
Suite 650
Washington, D.C. 20005

*Counsel for Plaintiff Zhejiang*
Dated: June 25, 2026          *Dingli Machinery Co., Ltd.*

28

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 5,115 words, less than the 7,000 word limit.

Pursuant to Judge Baker's rules, the undersigned certifies that this brief was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts—such as, but not limited to, ChatGPT or Google Bard.

/s/ *Dharmendra N. Choudhary*
Dharmendra N. Choudhary

*Counsel for Plaintiff*

Dated: June 25, 2026

15240471_6