UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: M. MILLER BAKER, JUDGE

| | |
|---|---|
| ZHEJIANG DINGLI MACHINERY CO., LTD., *Plaintiff*, v. UNITED STATES, *Defendant*, and COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, *Defendant-Intervenor*. | Court No. 24-00221 |

**<u>PLAINTIFF'S CORRECTED MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rule of the Court of International Trade, Plaintiff Zhejiang Dingli Machinery Co., Ltd. respectfully moves for judgment on the administrative record. For the reasons set forth in the accompanying brief in support of its motion, Plaintiff requests that the Court determine that the U.S. Department of Commerce's final results in its administrative review of the antidumping duty order

covering certain mobile access equipment and subassemblies thereof from the People's Republic of China, published as *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 88,730 (Nov. 8, 2024) are not supported by substantial evidence on the record and are otherwise not in accordance with law.

Plaintiff requests that the Court remand this matter to Commerce with instructions to recalculate the antidumping duty rate assigned to Plaintiff. The legal arguments in support of this motion are detailed in the attached Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Agency Record.

Respectfully submitted,

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn
Mia F. Howard

*599 Lexington Ave.,

36th Floor
New York, New York 10022
**
1201 New York Ave., NW
Suite 650
Washington, D.C. 20005

*Counsel for Plaintiff Zhejiang Dingli Machinery Co., Ltd.*

Dated: August 12, 2025

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: M. MILLER BAKER, JUDGE

ZHEJIANG DINGLI MACHINERY CO., LTD.,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,

*Defendant-Intervenor*.

Court No. 24-221

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CORRECTED MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn
Mia F. Howard

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*599 Lexington Ave., 36th Floor

New York, New York 10022
**
1201 New York Ave., NW,
Suite 650
Washington, D.C. 20005

*Counsel for Plaintiff Zhejiang Dingli Machinery Co., Ltd.*

Dated: August 12, 2025

# TABLE OF CONTENTS


USCIT RULE 56.2 STATEMENT ........................................................ 1

I. ADMINISTRATIVE DETERMINATION UNDER APPEAL.......... 1

II. ISSUES OF LAW AND SUMMARY OF ARGUMENT .................. 1

III. REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION ........................................................................ 3

STANDARD OF REVIEW.................................................................... 3

STATEMENT OF FACTS .................................................................... 6

ARGUMENT ..................................................................................... 12

I. COMMERCE IMPROPERLY SELECTED TURKEY INSTEAD OF BULGARIA AS THE PRIMARY SC ....................................... 12

A. Criteria for SC Selection ........................................................ 14

B. Turkish Import Data are Distorted by Hyperinflation............. 19

C. Turkish Financial Statements are Distorted by Hyperinflation and Countervailable Subsidies ................................................ 33

1. Tumosan's and Turk Traktor's Expenses and Revenue are Distorted Because They are Not Adjusted for Hyperinflation ........................................................................................ 34

2. Tumosan's Financial Statement is Suspected to be Distorted by Countervailable Subsidies ............................................ 42

D. Commerce Improperly Rejected Bulgaria Based on Deficiencies that Are Minor Relative to the Unreliability of Turkey's Data 47

II. COMMERCE UNLAWFULLY USED COHEN'S *d*....................... 55

III. COMMERCE UNLAWFULLY DEDUCTED SECTION 301 DUTIES FROM DINGLI'S U.S. SALES PRICES ......................... 56

A. Section 301 Duties are Not "U.S. Import Duties" ...................... 57

B. Section 301 Duties are "Special Duties" and Should Not Be Deducted from the U.S. Sales Price.......................................... 59

C. Deducting 301 Duties Would Double-Count ADDs................... 65

D. Deducting Section 301 Duties from U.S. Price is Contrary to Law, and Procedurally Defective ............ 66

CONCLUSION ............ 69

# TABLE OF AUTHORITIES

Page(s)

Cases

*AK Steel Corp. v. United States*,
988 F. Supp. 594 (CIT 1998)....65

*Allied Pacific Food (Dalian) Co. v. United States*,
435 F. Supp. 2d 1295 (CIT 2006)....17

*Chevron, U.S.A., Inc. v. NRDC, Inc*,
467 U.S. 837 (1984)....4

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)....3

*CP Kelco US, Inc. v. United States*,
2016 WL 1403657 (CIT Apr. 8, 2016)....18

*Fuyao Glass Indus. Grp. Co. v. United States*,
29 CIT 109 (2005)....45

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997)....4

*Hoogovens Staal BV v. United States*,
4 F. Supp. 2d 1213 (CIT 1998)....65

*Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*,
2025 WL 2092386 (CIT July 21, 2025)....5, 6, 55

*Jinko Solar Import and Export Co. v. United States*,
701 F. Supp. 3d 1367 (CIT 2024)....57

*Loper Bright Enter. v. Raimondo*,
603 U.S. 369 (2024)....4, 5, 19

*Marmen Inc. v. United States*,
134 F.4th 1334 (Fed. Cir. 2025) .................................................. 55, 56

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984) .............................................................. 3

*Neimenggu Fufeng Biotechnologies Co. v. United States*,
741 F. Supp. 3d 1354 (CIT 2024) ........................................................ 57

*Peer Bearing Co.-Changshan v. United States*,
27 CIT 1763 (2003) ............................................................................... 45

*Save Domestic Oil, Inc. v. United States*,
357 F.3d 1278 (Fed. Cir. 2004) .............................................................. 6

*In re Section 301 Cases*,
570 F. Supp. 3d 1306 (CIT 2022) ........................................................ 62

*Shanghai Tainai Bearing Co. v. United States*,
2024 WL 5154032 (CIT Dec. 18, 2024), *appeal pending*,
Fed. Cir. No. 25-1405 (docketed Jan. 31, 2025) ................................. 57

*Shanghai Tainai Bearing Co. v. United States*,
No. 23-20, 2024 WL 5154030 (CIT Dec. 18, 2024) .............................. 57

*Shenzhen Xinboda Indus. Co. v. United States*,
976 F. Supp. 2d 1333 (CIT 2014) .................................................. 20, 43

*SKF USA, Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001) .............................................................. 6

*TransWeb, LLC v. 3M Innovative Properties Co.*,
812 F.3d 1295 (Fed. Cir. 2016) ............................................................ 23

*Tri Union Frozen Products, Inc. v. United States*,
227 F. Supp. 3d 1387 (CIT 2017) .................................................. 16, 17

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ................................................................................ 4

*Wheatland Tube Co. v. United States*,
495 F.3d 1355 (Fed. Cir. 2007) .................................................. 59, 60, 61

*Xiamen Int'l Trade & Indus. Co. v. United States*,
953 F. Supp. 2d 1307 (CIT 2013).................................................17-18

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*,
31 CIT 159 (2007)............................................................................45

Statutes

19 U.S.C. § 1516.........................................................................3, 31

19 U.S.C. § 1673.............................................................................63

19 U.S.C. § 1677.......................................................................*passim*

19 U.S.C. § 2411......................................................................62, 63

Antidumping Act of 1921 ..........................................................67-68

Trade Act of 1974 § 301 ....................................................................57

Administrative Decisions

*Aluminum Foil from the People's Republic of China*,
88 Fed. Reg. 76,734 (Nov. 7, 2023) ..................................................54

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg.
27,296 (May 19, 1997)........................................................................17

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 75 Fed. Reg. 47,771 (Aug. 9, 2010)
(final results) ....................................................................................51

*Certain Glass Containers from the People's Republic of China*, 85 Fed. Reg. 58,333 (Sept. 11, 2020)
(final determination)..........................................................................54

*Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China*, 75 Fed. Reg. 57,449 (Sept. 21, 2010) (final determination) .......... 51-52

*Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Nov. 8, 2017) (final determination) ............ 22, 23

*Circular Welded Carbon-Quality Steel Pipe from the People's Republic of China*, 81 Fed. Reg. 75,042 (Oct. 21, 2016) (final determination) ........................................................................ 54

*Crystalline Silicon Photovoltaic Cells from the People's Republic of China*, 81 Fed. Reg. 39,905 (June 20, 2016) (final results) ................................................................................ 16

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China,* 87 Fed. Reg. 38,379 (June 28, 2022) (final determination) .............................................................................. 38

*Drawn Stainless Steel Sinks from the People's Republic of China*, 88 Fed. Reg. 76,174 (Nov. 6, 2023) ......................................... 20

*Glycine from the People's Republic of China*, 74 Fed. Reg. 41,121 (Aug. 14, 2009) (final results) ........................................... 50, 51

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021 (June 12, 2023) ..................................................... 6

*Metal Lockers and Parts Thereof from the People's Republic of China*, 86 Fed. Reg. 35,737 (July 7, 2024) ................................ 40, 41

*Mobile Access Equipment and Subassemblies* Thereof *from the People's Republic of China*, 89 Fed. Reg. 88,730 (Nov. 8, 2024) (final results) ........................... 1, 12

*Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 89 Fed. Reg. 35,607 (May 1, 2024) (preliminary Results) ................................................ 11

*Passenger Vehicle and Light Truck Tires from the Republic of Korea*, 90 Fed. Reg. 19,673 (May 9, 2025) .......................................38

*Silicomanganese from Kazakhstan,* 67 Fed. Reg. 15,535 (Apr. 2, 2002) (final determination) .......................................................9

*Stainless Steel Wire Rod from Korea,* 69 Fed. Reg. 19,153 (Apr. 12, 2004) (final results) ...................................................... *passim*

*Steel Nails from the People's Republic of China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013) (final results) .............................15

*Steel Wire Garment Hangers from the People's Republic of China*, 76 Fed. Reg. 27,994 (May 13, 2011) (final results).................48

*Steel Wire Garment Hangers from the People's Republic of China*, 83 Fed. Reg. 53,449 (Oct. 23, 2018) (final results) .................50

*Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012) (final determination).............................................................................5

*Xanthan Gum from China*, 86 Fed. Reg. 16,189 (Mar. 26, 2021) (final results).......................................................66-67

## Other Authorities

Commerce Policy Bulletin No. 04.1 (Mar. 1, 2004) .................................14

*Notice of Action and Request for Public Comment concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (June 20, 2018) ...................58, 61, 68

*Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83. Fed. Reg. 40,823 (Aug. 16, 2018) ......................................................................63

Office of the U.S. Trade Rep., China Section 301 – Tariff Actions and Exclusions Process ........................................................ 64

Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100-576 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547 ................ 43

Panel Report, United States — Tariff Measures On Certain Goods From China, WTO Doc. WT/DS543/R (adopted Sept. 15, 2020) .................................................................... 68, 69

*Presidential Memorandum on the Actions by the United States Related to the Section 301 Investigation* (Mar. 22, 2018) ....................................................................................... 58

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 ............................................................ 60

## Glossary of Abbreviations

| | |
|---|---|
| ADD: | Antidumping Duty |
| AR1: | First Administrative Review |
| AUV: | Average Unit Value |
| BG: | Bulgarian Lev |
| BITT: | Banking and Insurance Transaction Tax |
| CAFC: | Court of Appeals for the Federal Circuit |
| CPI: | Consumer Price Index |
| CQR: | Dingli's Section C Questionnaire Response |
| ETFET: | Exchange Tax for Foreign Exchange Transactions |
| FOP: | Factor of Production |
| GOC: | Government of China |
| GTA: | Global Trade Atlas |
| HTSUS: | Harmonized Tarff Schedule of the United States |
| IAS: | International Accounting Standard |
| IDM: | Issues & Decision Memorandum |
| IMF: | International Monetary Fund |
| MAE: | Mobile Access Equipment and Subassemblies Thereof |
| ME: | Market Economy |

| | |
|---|---|
| NME: | Non-Market Economy |
| NV: | Normal Value |
| PDM: | Preliminary Decision Memorandum |
| PMS: | Particular Market Situation |
| POR: | Period of Review |
| PPI: | Producer Price Index |
| SAA: | Statement of Administrative Action |
| SC: | Surrogate Country |
| SV: | Surrogate Value |
| TDM: | Trade Data Monitor |
| TLR: | Turkish Lira |
| TLR-USD: | Turkish Lira to U.S. Dollar |
| USTR: | United States Trade Representative |
| WTO: | World Trade Organization |

Plaintiff Zhejiang Dingli Machinery Co., Ltd. ("Dingli") hereby submits this brief in support of its Motion for Judgment on the Agency Record.

## USCIT RULE 56.2 STATEMENT

## I. ADMINISTRATIVE DETERMINATION UNDER APPEAL

Plaintiff seeks judicial review of the U.S. Department of Commerce's ("Commerce" or the "Department") final results in the first administrative review ("AR1") of the antidumping duty ("ADD") order on certain mobile access equipment and subassemblies thereof ("MAE") from the People's Republic of China ("China"). *MAE from China*, 89 Fed. Reg. 88,730 (Nov. 8, 2024), PR 298 ("*Final Results*"), Appx1035-1036. The challenged determinations, findings, and conclusions are set out primarily in the Issues and Decision Memorandum ("IDM") accompanying the *Final Results*, PR 294, Appx1038-1108.

## II. ISSUES OF LAW AND SUMMARY OF ARGUMENT

1. Commerce unlawfully selected Turkey, which is plagued by hyperinflation and countervailable subsidies, over Bulgaria as the surrogate market economy ("ME") country for China in AR1. Commerce's decision was contrary to its statutory mandate to select

surrogate values ("SV") based on the best information available, and contrary to its own established practice. The Turkish import data are distorted by the pervasive hyperinflation in Turkey during the period of review ("POR"), causing unit value bias and skewed Turkish Lira ("TLR") to U.S. Dollar ("USD") exchange rates. Such distortions in the domestic Turkish prices cascade into distorted import prices, thereby making these data wholly unreliable.

2. Commerce's selection of Turkish financial statements, which are not adjusted to account for hyperinflation and contain evidence of the receipt of countervailable subsidies, over complete, accurate, and reliable Bulgarian financial statements was not supported by substantial evidence and was otherwise not in accordance with law.

3. Commerce's rejection of Bulgaria as the primary ME surrogate country was not supported by substantial evidence and was otherwise not in accordance with law, because Bulgaria, in comparison to Turkey, provided the best information available for SV calculations.

4. Commerce's use of the Cohen's *d* test in its differential pricing analysis was directly contrary to controlling legal precedent recently issued by the Court of Appeals for the Federal Circuit ("CAFC").

5. Commerce's decision to deduct Section 301 duties from Dingli's U.S. sales price was unsupported by substantial evidence and unlawful. First, Commerce incorrectly categorized Section 301 duties as "United States Import Duties," although they are actually "Special Duties," which should not be deducted from the U.S. sales price. Second, deducting Section 301 duties double counted ADD. Third, deducting Section 301 duties is contrary to controlling United States and World Trade Organization ("WTO") precedent and is procedurally defective.

## III. REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

Plaintiff's reasons for contesting the administrative determination are set out below.

## STANDARD OF REVIEW

This Court must hold unlawful any aspect of Commerce's decisions that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United*

*States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). Rather "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The Supreme Court recently overruled *Chevron, U.S.A., Inc. v. NRDC, Inc*, 467 U.S. 837 (1984), which had directed courts to defer to reasonable interpretations of ambiguous statutes by administrative agencies. *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 369-70, (2024) ("Courts need not . . . defer to an agency interpretation of the law simply because a statute is ambiguous."). *Loper* underscores the "solemn duty of the Judiciary" to interpret statutes and "say what the law is." *Id.* at 385 (internal quotations omitted). Further, *Loper* forecloses this Court from affirming the Commission's decision merely upon finding that the government's statutory interpretations is "reasonable," and for that reason alone, "must" affirm. *Id.* at 395, 400.

*Loper* clarified that it "makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best. **In the business of statutory interpretation, if it is not the best, it is not permissible**." *Id.* (emphasis added); see also *Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*, 2025 WL 2092386, *4 (CIT July 21, 2025) ("Commerce must select the best available information, meaning it must choose the information available to it that is better than all other information on the record. The phrase 'best available information' means that which is better than all other information available. 'Best' is an adjective defined as 'excelling all others.' . . . Thus, the Court reviews whether Commerce's selection of Romania as the primary surrogate country, because its information is better than all other information available, is supported by substantial evidence, i.e., reasonable on this record.")

Commerce by statute, "in valuing {FOPs} . . . **shall utilize, to the extent possible**, the prices or costs of {FOPs} in **one or more market economy countries** that are –(A) at a level of economic development comparable to that of the nonmarket economy {"NME"}; and (B) **significant producers of comparable merchandise**." *Id.* (emphases

added); 19 U.S.C. § 1677b(c)(4) (emphasis added). Such "valuation . . . **shall be based on the best available information** regarding the values of such factors in a market economy country or countries." *Id.* § 1677b(c)(1)(B) (emphasis added).

Finally, "if Commerce had a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## STATEMENT OF FACTS

In June 2023, Commerce initiated AR1 of the ADD order on MAE from China. *Initiation of Antidumping and Countervailing Duty Administrative Review*, 88 Fed. Reg. 38,021, 38,027 (June 12, 2023), PR 6. Subsequently, Commerce selected Dingli as a mandatory respondent. Commerce Respondent Selection Memorandum (July 25, 2025), PR 37, CR 21, Appx3345-3351. Dingli fully participated in AR1 by timely filing complete and accurate responses to Commerce's questionnaires. *See,*

*e.g.*, Dingli Section C Questionnaire Response (Sept. 21, 2023), PR 89-90, CR 62-81 ("CQR"), Appx1116-1171.

In October 2023, Commerce solicited surrogate country ("SC") and SV information. Commerce's SC/SV Request (Oct. 30, 2023), PR 99, Appx3369-3371. Commerce provided a non-exhaustive list of six countries, Romania, Chile, Bulgaria, Costa Rica, Malaysia, and Turkey, at the same level of economic development as China. *Id.* Attachment I, Appx3372-3378. Commerce requested information on: (1) that list; (2) SC selection; and (3) factors of production ("FOP") valuation. *Id.*

In response, Dingli commented that, per established agency practice, all six countries are at the same level of economic development as China. Dingli SC List Comments (Nov. 6, 2023), PR 103, Appx3380-3383. Further, Dingli noted that Commerce is "not required to limit its selection of {SVs} from countries specified on the Department's initial 'short list' of six surrogate countries{.}" *Id.* at 2, Appx3381. Dingli accordingly urged Commerce to be open to considering countries at the same or comparable level as China that were not contained in Commerce's "short list." *Id.* Finally, Dingli suggested even if Commerce chose the primary SC from the short list, that it remain open to

accepting SV or benchmark price data from any of the other five countries or from any other non-listed economically comparable country. *Id.* at 3, Appx3382.

Subsequently, Dingli submitted comments reiterating that all six countries fulfilled the statutory criteria of economic comparability. Dingli SC Comments (Nov. 16, 2023), PR 105, at 4-5, Appx3390-3391. Dingli then established that, based on relevant export-import data, all six countries satisfied the statutory criterion of significant production of comparable merchandise. *Id.* at 5-6, Appx3391-3392. Dingli argued that the primary SC should be the country that offers the best quality of SV data for material inputs and financial statements of producers of identical merchandise. *Id.* That same day, the Defendant-Intervenor, the Coalition of American Manufacturers of Mobile Access Equipment ("Petitioner") filed comments stating that it was unable to recommend any particular SC at that time. Petitioner SC Comments (Nov. 16, 2023), PR 107, at 2, Appx3398.

In December 2023, Dingli provided SV information from Malaysia to value FOPs. Dingli First SV Submission (Dec. 14, 2023), PR 127-35, Exhibit 1, Appx3404-3430. That same day, Petitioner filed its initial SV

submission, in which it argued Commerce should select Turkey as the primary SC and provided Turkish SV information to value FOPs. Petitioner First SV Submission (Dec. 14, 2023), PR 139-40, at 3-4, Appx1616-1617.Subsequently, Petitioner filed a rebuttal to Dingli's first SV submission, including Malaysian import data and antidumping duty orders on products allegedly unfairly traded in Malaysia. Petitioner First SV Rebuttal (Dec. 21, 2023), PR 147, Exhibits 1-3,Appx5189-5210.

In March 2024, Dingli filed factual information urging Commerce to reject both the Cohen's *d* test and the differential pricing analysis. Dingli Factual Information Re: Differential Pricing Analysis (Mar. 27, 2024), PR 177-86, at 2, Appx5467.

Shortly thereafter, both Dingli and Petitioner filed their final SV submissions. Dingli provided SV information from Bulgaria, Romania, Malaysia, and Turkey. Dingli Final SV Submission (Mar. 27, 2024), PR 187-212, Appx5841-5849. Petitioner argued that Turkey should be selected as the primary SC. Petitioner Final SV Submission (Mar. 27, 2024), PR 213-20, at 2-3, Appx11901-11902.

Four days later, Dingli filed comments asking Commerce in the preliminary results to reject Turkey due to pervasive distortive

hyperinflation and instead accept either Bulgaria or, alternatively, Malaysia as the primary SC. Dingli Pre-Preliminary Comments (Apr. 1, 2024), PR 221, at 1-2, Appx12116-12117. Dingli also submitted a rebuttal to Petitioner's Final SV Submission, providing, *inter alia*, data demonstrating that Turkish steel average unit values ("AUV") were "upwardly distorted by hyperinflation during the POR." Dingli SV Rebuttal (Apr. 15, 2024), PR 239-241, at 5-6, Appx12740-12741.

Subsequently, Petitioner attempted to rebut the Bulgarian, Romanian, and Malaysian financial statements provided by Dingli as well as Dingli's evidence of pervasive distortive hyperinflation in Turkey. Petitioner Final SV Rebuttal (Apr. 8, 2024), PR 223-226, at 2-3, Appx12160-12161. Petitioner then filed comments arguing that Turkey should be chosen as the primary SC in the preliminary results. Petitioner Pre-Preliminary Comments (Apr. 11, 2024), PR 236, at 3, Appx12657. Dingli thereafter rebutted these comments, arguing, *inter alia*, that Petitioner's arguments in favor of Turkey were meritless. Dingli Rebuttal to Pre-Preliminary Comments (Apr. 15, 2024), PR 243, at 6-13, Appx12704-12710. Dingli continued to advocate for either

Bulgaria, Malaysia, or Romania as the primary SC. *Id.* at 13-24, Appx12711-12722.

On May 1, 2024, Commerce issued its AR1 preliminary results, assigning Dingli a 9.33% ADD rate. *MAE from China*, 89 Fed. Reg. 35,607, 35,608 (May 1, 2024) , PR 257 ("*Preliminary Results*"), Appx1001-1002; Preliminary Decision Memorandum (Apr. 25, 2024), PR 249 ("PDM"). Commerce preliminarily selected Turkey as the primary SC. Commerce Preliminary SV Memorandum (Apr. 25, 2024), PR 250 ("SV Memo") at 2, Appx12904. In calculating this rate, Commerce relied on Cohen's *d* in its differential pricing analysis and deducted Section 301 duties from Dingli's U.S. sales price. PDM at 18-20,Appx1022-1024.

In its case brief, Dingli requested that Commerce reject Turkey and instead select Bulgaria as the primary SC, while relying on Malaysian data to value certain steel inputs. Dingli Revised Case Brief (June 20, 2024), PR 280, CR 242 ("Dingli Brief"), at 1-25, Appx2831-2855. Moreover, Dingli argued that Commerce's application of Cohen's *d* in its differential pricing analysis was unlawful and that Section 301 duties should not have been deducted from Dingli's U.S. sales prices. *Id.* at 45-65, Appx2875-2895. Dingli next submitted a rebuttal brief,

arguing, *inter alia*, that Commerce should reject Petitioner's suggestion to value certain inputs using Turkish, rather than Bulgarian, SVs. Dingli Rebuttal Brief (June 17, 2024) PR 274, CR 238, at 13-24, Appx2696-2707.

On November 8, 2024, Commerce published the *Final Results*, assigning Dingli a 12.39% ADD rate. 89 Fed. Reg. at 88,730, Appx1035. Commerce rejected Dingli's SC/SV arguments. IDM Comments 1-5, Appx1042-1071. Commerce continued to (1) use Turkey as the primary SC; (2) apply Cohen's *d*; and (3) deduct Section 301 Duties from Dingli's U.S. sale prices. *Id.* at Comments 1, 9-10, Appx1042-1049, Appx1079-1083. On December 9, 2024, Dingli initiated this appeal. Summons (Dec. 9, 2024); Complaint (Jan. 8, 2025).

## ARGUMENT

### I. COMMERCE IMPROPERLY SELECTED TURKEY INSTEAD OF BULGARIA AS THE PRIMARY SC

In the *Final Results*, Commerce selected Turkey instead of Bulgaria as the primary surrogate country. IDM Comments 1 & 3, Appx1042-1049, Appx1057-1063. Commerce articulated two reasons for preferring Turkey over Bulgaria. First, "Dingli failed to provide

calculated inflators, based on Bulgarian overall {producer price index ("PPI")}, with which to inflate the 2020 data for movement expenses to reflect the POR {while} . . . the record contained readily available Turkish PPI inflators, with which to inflate the 2020 data for movement expenses." *Id.* at 22, Appx1059. Second, unlike Turkey, "Bulgaria does not afford Commerce with two high-quality sets of financial statements for producers of merchandise comparable to MAE." *Id.* at 26, Appx1063. Commerce also rejected Dingli's argument "that hyperinflation impacted the Turkish SV data, used in the *Preliminary Results*, rendering such data unreliable . . . {or} that Turkish import AUVs and Turkish financial ratios are distorted." IDM at 8, Appx1045.

As set forth below, Commerce's choice of Turkey is directly contradicted by overwhelming record evidence demonstrating that Turkish SV data and financial statements are severely distorted by hyperinflation, rendering them unreliable and therefore unusable. In contrast, Bulgaria affords SVs and financials that are undistorted by hyperinflation. Further, the perceived deficiencies with Bulgarian SV data – (a) missing PPI data for inflating movement SVs from 2020 to

2022, and (b) minor issues with the two Bulgarian financial statements – do not render these data and statements unreliable.

### A. Criteria for SC Selection

In NME ADD proceedings, Commerce is required by law to value FOPs based on the "best available information" in one or more suitable market economy countries. 19 U.S.C. § 1677b(c)(1)(B). If the competing potential surrogate countries satisfy the statutory criteria of economic comparability and significant production of comparable merchandise, Commerce's well-established policy is to select "the country with the best factors data . . . as the primary surrogate country {because} data quality is a critical consideration affecting surrogate country selection." Commerce Policy Bulletin No. 04.1 (Mar. 1, 2004).[1]

To administer this policy, Commerce asks parties to "submit information regarding the selection of a surrogate country" focusing on major inputs and financial statements:

(1) "availability and quality of data within that single country for the **major {FOPs}**" and

---

1 https://access.trade.gov/Resources/policy/bull04-1.html.

> (2) "availability and quality of **financial statements** within that country **for producers of merchandise identical** or comparable **to the merchandise subject to this review**."

Commerce SC/SV Request at 1-2 (emphases added), Appx3369-3370.

The quality of major FOPs' SV data constitutes a critical factor in the primary surrogate country selection. *See Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012) (final determination), IDM Comment 1 ("the Department has selected Thailand as the surrogate country for the final determination because . . . . Thailand offers the best available SV data . . . . {T}he Department has also found that Thai import data allows the Department to value each respondent's steel plate, which accounts for a significant portion of each company's normal value {("NV")}, more accurately than either the South African or Ukrainian data because the Thai data is most specific to the size and chemistry of the respondents' steel plate.").

Next, because financial ratios account for a substantial proportion of NV, Commerce specifically identifies the quality of financial statements, underscoring their critical importance in selecting a primary surrogate country. *Steel Nails from China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013) (final results), IDM Comment 1D ("Unlike Ukraine,

which upon fuller consideration has no useable financial statements on the record, as discussed below, the Department finds that Thailand has reliable information to value all of the inputs, including two financial statements to calculate the financial ratios, that compose the Respondents' respective {NV} calculations.").

In contrast, the data quality of minor FOPs (which account for an insignificant proportion of NV) is of limited importance in Commerce's SC selection process. *Crystalline Silicon Photovoltaic Cells from China*, 81 Fed. Reg. 39,905 (June 20, 2016) (final results), IDM Comment 1 ("we continue to choose Thailand as the primary surrogate country . . . . Thai {SV} data cover all of the {SVs} that the Department requires with the exception of chlorine, a minor input . . . . {C}hlorine is the only input for which the record does not include Thai surrogate data. However, chlorine is a minor input, accounting for an insignificant portion of direct material costs . . . .").

In choosing the best primary surrogate country, "Commerce endeavors to use data that is non-aberrational and reliable." *Tri Union Frozen Products, Inc. v. United States*, 227 F. Supp. 3d 1387, 1394 (CIT

2017) (citing *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (May 19, 1997)). As this Court has emphasized:

> Commerce has explained the need for reliable {SVs} by emphasizing that it is precisely 'the unreliability of NME prices that drives {Commerce} to use the special NME methodology in the first place.' . . . {SVs} serve as substitutes for what Commerce considers to be unreliable NME data.

*Id.* at 1395 (citing 62 Fed. Reg. at 27,366). Data are generally considered "aberrational" when they are either extreme outliers, distorted, misrepresentative, or otherwise incorrect. *Id.* at 1394-95.

When datasets from competing SCs are imperfect, Commerce must "conduct a fair comparison of the data sets on the record." *Allied Pacific Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295, 1313-14 (CIT 2006). This Court cautions that:

> To support a {SV} with substantial evidence, Commerce "must do more than simply identify flaws in the data sets it rejects." *Guangdong Chems. Imp. & Exp. Corp. v. United States*, 30 CIT 1412, 1417 . . . (2006); *see also Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 495 . . . (2004) (noting that Commerce errs by "discard{ing} the alternatives as flawed" without "evaluat{ing} the reliability of its own choice"). "Commerce must also apply the same criteria to the data upon which it relies, and explain how the preferred data meet these criteria, or why a given criterion should not apply to the preferred data." *Guangdong Chems.*, 30 CIT at 1417 . . . .

*Xiamen Int'l Trade & Indus. Co. v. United States*, 953 F. Supp. 2d 1307, 1316 (CIT 2013).

Application of these factors to the facts in this case should have resulted in Commerce selecting Bulgaria as the primary SC. In selecting Turkey, Commerce unlawfully ignored the fact that hyperinflation significantly distorted Turkish material SVs and Turkish financial statements –while improperly accentuating the unavailability of Bulgarian PPI data (applied to inflate SVs of movement FOPs, which are relatively minor FOPs). Commerce also erred in rejecting the Bulgarian financial statements. Consequently, Commerce's selection of Turkey results in an inferior choice that is inconsistent with the statutory mandate to use the "best available information" to value FOPs.

Commerce also erred by resorting to a disjunctive analysis rather than the judicially mandated conjunctive "side-by-side" comparative analysis of Turkish and Bulgarian SV data, which is required to "explain, why, on the whole," despite "different flaws," Turkey was "a better source." *CP Kelco US, Inc. v. United States*, 2016 WL 1403657, *2 (CIT Apr. 8, 2016) ("Commerce, by bifurcating its analysis into two

steps, end-ran its obligation to base its decision in substantial evidence. . . . Given that both sets of financial statements had different flaws, Commerce 'should have compared the two side-by-side.'").

Accordingly, Commerce's primary SC selection is unlawful as the agency deviated – without explanation – from the statutorily mandated and judicially affirmed longstanding agency policy and practice to select the "best available information". In reviewing Commerce's methodology upon which its decision was based, this Court must exercise its independent judgment in deciding whether Commerce's methodology resulted in reliance on the "best available information." *See Loper Bright*, 603 U.S. at 369-70, 400.

**B. Turkish Import Data are Distorted by Hyperinflation**

In its *Final Results*, Commerce selected Turkey as the primary SC, despite substantial record evidence showing that Turkish material SVs based on Turkish import data are unreliable due to pervasive distortive hyperinflation in Turkey throughout the POR. Dingli Brief at 3-16, Appx2833-2846; Dingli Final SV Submission Exhibits TR-9A–9F, Appx10051-10053, Appx10332-10342. As set forth below, Commerce's rationale is unsupported by this record and applicable precedent.

First, Commerce reasons that Turkey "has remained on Commerce's surrogate country list for investigative periods dating back to at least 2019 and has been used as a {SC} in multiple proceedings." IDM at 7, Appx1044. However, the fact that Commerce used Turkey as a SC in other proceedings does not control the outcome in this proceeding where the record contains substantial evidence that hyperinflation in Turkey during the POR distorted Turkish SVs. *Drawn Stainless Steel Sinks from China*, 88 Fed. Reg. 76,174 (Nov. 6, 2023), IDM Comment 3 ("the record of each review stands alone."); *Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333, 1346 (CIT 2014) ("It goes without saying that each administrative review involves different arguments and a different administrative record (and, not infrequently, different data sets and different parties) and therefore must be considered on its own merits.").

Moreover, all prior cases upon which Commerce relies are distinguishable because hyperinflation was not addressed. IDM at 7 n.19. Further, Turkey's inclusion on the SC list is based simply on its *per capita* GNI being close to those of China – an extraneous fact that

cannot confer legitimacy on the inferior and unreliable Turkish SV data. Therefore, Commerce's rationale is without merit.

Second, Commerce improperly reasoned that "inflation cannot automatically preclude the consideration of Türkiye as a primary surrogate country." IDM at 7, Appx1044. This statement ignores a plethora of record evidence establishing a linkage, during the POR, between Turkish hyperinflation and its severely distorted SV data and financial statements, rendering them unreliable. In contrast, Bulgaria did not experience any hyperinflation and no record evidence indicates that the Bulgarian SV data and financial statements are distorted or unreliable.

Third, while conceding the "existence of hyperinflation in Türkiye during the POR, . . . Commerce disagrees . . . that Turkish import AUVs . . . are distorted." IDM at 8. In this regard, Commerce attempts to impeach an expert opinion of International Monetary Fund ("IMF") Economist Marshall Reinsdorf, Ph.D., that Dingli placed on the record. Dingli Final SV Submission Exhibit TR-9B-1 ("Reinsdorf Opinion"), Appx10333-10342. The Reinsdorf Opinion concludes that "the Turkish . . . hyperinflation . . . significantly affected the domestic market prices of

steel inputs and import prices mirror the hyperinflationary trends of domestic prices during the POR." *Id.*, Appx12120. Commerce's response is that the expert "was retained by Dingli's counsel to provide an opinion beneficial to Dingli's interests" and dismisses this opinion as potentially tainted by "'study bias' *. . .* and {containing} conclusions that were tailored to generate a desired result." IDM at 8, Appx1045.

This Court should reject Commerce's summary dismissal of the Reinsdorf Opinion. This well-researched opinion is based on objective evidence and data from multiple highly reliable international data sources including the IMF and the Turkish Statistical Institute. Tellingly, Commerce nowhere challenges the authenticity of these data. Commerce also fails to support its allegation regarding the Reinsdorf Opinion being biased, manipulated, or conclusory. Additionally, while preaching that such opinions should be "cautiously examined" to see if they are based on "sound methodologies," Commerce skirts any serious analysis of the methodologies used by Mr. Reinsdorf. *Id.* As such, this Court should reject Commerce's generalized opposition to this opinion.

Further Commerce misplaces reliance on *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Nov. 8, 2017) (final

determination) ("*Canada Lumber*"). IDM at 8 n.25. *Canada Lumber* is distinguishable "because there {wa}s no evidence that the study used statistically valid sampling methodologies in selecting these 13 sites, {and therefore} the Department {could} not determine that the information in the study provide{d} a representative sample." 82 Fed. Reg. 51,814, IDM Comment 19. In contrast, Commerce fails to pinpoint to analogous concerns with the data or methodologies used in the Reinsdorf Opinion. Additionally, the Reinsdorf Opinion is supported by "contemporaneous documentary evidence provid{ing} greater corroborative value." *TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1302 (Fed. Cir. 2016) (cited in *Canada Lumber*, 82 Fed. Reg. 51,814, IDM Comment 19 n.355). Moreover, the instant record lacks an alternative superior unbiased study such as the one afforded to *Canada Lumber*.

Further, Commerce unpersuasively attempts to minimize the impact of hyperinflation, by arguing that the hyperinflationary problem resulted from differences in the currency of the transaction. Commerce claims "that hyperinflation in Türkiye significantly affected the domestic market prices of inputs, as measured in the local currency,

lira, and that imports of same inputs, measured in lira, would exhibit similar hyperinflationary trends." It reasons that "Turkish AUV import data, used in the *Preliminary Results*, are not denominated in Lira, but are denominated in Euro." IDM at 9, Appx1046. Commerce asserts that Euro based import data "would not exhibit the same inflationary trends as those traded and settled in lira," and argues that "the record is silent on in which specific currency, *i.e.*, Turkish lira, U.S. dollars (USD), or euros, the preponderance of Turkish imports for HS categories used in the *Preliminary Results* were actually traded and settled." *Id.*

These arguments are rebutted by substantial record evidence showing that the Trade Data Monitor ("TDM") Turkey import data ***are officially reported in Turkish Lira***. Dingli Final SV Submission Exhibits TR-1–2, Appx10056-10079. Additionally, Dingli's statement that "the {Global Trade Atlas ("GTA")} Turkish import data also is originally reported in Turkish Lira, a fact that the Department can readily verify since it has access to the GTA database" Dingli Brief at 10, Appx2840, has not been challenged. It is also reasonable to presume that Turkey reports its official trade data in the local currency (*i.e.*, Lira) instead of a foreign currency (Euro). Indeed, Petitioner illuminates how the *Final*

*Results* may have obtained Euro denominated Turkish import data, as GTA (or TDM) permit data downloads in any currency. Petitioner's Rebuttal Brief at 13 n.14, Appx2759. Moreover, Commerce's twin concessions – that (1) imports traded in Turkish Lira (TLR) are distorted by hyperinflation; and (2) the proportion of imports settled in Euro is unclear – strongly indicate that all Turkish import data are distorted by hyperinflation, and are accordingly, unreliable.

Fourth, Commerce disregards the de-dollarization of the Turkish economy during July 2021 – August 2022, which was recognized by Commerce in the Canadian AD investigation on Turkish rebar. Dingli Brief at 13, Appx2843. This de-dollarization establishes that during the overlapping POR (April 13, 2022 – March 31, 2023), TLR was the primary currency in the Turkish financial system, including for trading. This fact, in turn, strongly suggests that the majority of Turkish POR imports were denominated in hyperinflation-distorted TLR, rather than Euro. *Id.* at 15, Appx2845. Yet Commerce claims that "the Canadian government's determination is based on its own distinctive record information . . . {and} does not serve as a binding precedent" IDM at 10, Appx1047. This alibi is unavailing because the record in this proceeding

does not contain any information contradicting Commerce's factual findings in the Canadian investigation.

Fifth, Commerce fails to counter evidence establishing that the government-controlled adjustments to Turkish foreign exchange rates were heavily skewed, exacerbating the hyperinflation-induced distortive import price data. Commerce initially deflects this argument reasoning that "Dingli relies on the Canadian government's finding in a Canadian antidumping investigation of rebar from Türkiye" IDM at 9, Appx1046, and "conflates the Turkish government's de-dollarization policy efforts with the alleged manipulation of the official exchange rate." *Id.* at 10, Appx1047. However, the Turkish government's unrebutted de-dollarization policy confirms its overt meddling in the Turkish financial system, distorting the currency market in favor of TLR. This fact, in turn, has a direct linkage to the skewed TLR-USD exchange rate, and dovetails with other independent record evidence regarding the Turkish government's meddling in setting the severely depressed TLR-USD exchange rate. Dingli Brief at 8, Appx2838.

Commerce further failed to counter Dingli's key arguments concerning distortion of AUVs from Turkish government's exchange rate manipulation, as explained below.

First, that Turkish government intervened to manipulate the official exchange rates, delinking them from the hyperinflation index in the Turkish market as normally should have occurred. Dingli Brief at 10-11, Appx2840-2841. Commerce states that "Dingli also hypothesizes that the artificially understated official inflation rate in Türkiye caused the Turkish government's manipulation of official exchange rates to limit the depreciation of the lira against USD (and presumably euro)." IDM at 10, Appx1047. Commerce's attempt to dilute this critical issue should be rejected. During the POR, the 30% depreciation of the government-controlled TLR-USD exchange rate (and, by extension TLR-Euro exchange rate) significantly lagged even the understated official 58% Consumer Price Index ("CPI") inflation. Dingli Brief at 12, Appx2842. As such, the tightly controlled TLR-USD exchange rate is divorced from not only the actual hyperinflation rates but even the understated official hyperinflation rates. In turn, this explicit disconnect caused a distortion of the resulting AUV from the import

data even when denominated in foreign currencies like USD or Euro. Therefore, Commerce's principal rationale – that Turkish import data reported in Euro were insulated from the vagaries of hyperinflation – is directly contradicted by substantial record evidence.

Second, Commerce concedes that trade data recorded and reported in TLR were distorted by hyperinflation, IDM at 9, but fails to recognize the additional distortions resulting from the methodology used to convert AUVs from TLR to Euro in a hyperinflation situation. Dingli Brief at 11-12, Appx2841-2842. For each U.S. sale, Commerce's margin calculation program converts NV (*i.e.*, comparison price) to Euro based on the applicable exchange rate prevailing on the date of sale (instead of the POR average TLR-Euro exchange rate). *Id.* This methodology automatically results in a skewed Euro equivalent NV in a hyperinflationary economy due to an inherent asymmetry between:

1. SVs of individual inputs calculated on a quantity-weighted average basis **for the <u>entire POR</u>** in TLR, and then aggregated to form the NV of subject merchandise in TLR; and

2. NV converted to Euro from TLR applying an exchange rate **on a <u>specific day</u>** of the 12-month POR.

*Id.*

As such, in a hyperinflation economy like Turkey, the computed NV and the resulting ADD margin, based on imports of inputs denominated in TLR, are inherently distortive. The Reinsdorf Opinion confirms that in a 30% upwardly ascending exchange rate economy, "using the exchange rate at any specific point in time in 2022 to convert the unit value average price for March 2022-April 2023 from Turkish liras to US dollars would therefore cause a significant overstatement of the dollar price of the item in question." Dingli Final SV Submission Exhibit TR-9B-1 at 7, Appx10340.

Commerce's reply that "currency exchange rates are influenced not only by inflation, but also by numerous other factors" is speculative and unexplained. IDM at 10, Appx1047. Moreover, Commerce contradicts itself by admitting that "there is no information suggesting whether other aforementioned factors may also contribute to this phenomenon, while others may act to arrest the degree of currency depreciation or, in fact, make the currency appreciate." *Id.*

In sum, the record establishes that there is not substantial evidence supporting Commerce's conclusion that: "there is no record evidence to conclude, definitively, much less support with empirical

evidence, that Turkish import AUVs measured in euros are overstated or distorted, on account of hyperinflation in Türkiye, and the alleged suppression in the depreciation of lira, rendering Turkish import AUVs unreliable." *Id.*

Sixth, Commerce relied on Petitioner's submitted data to reason that "prices remained stable across the POR for the vast majority of HS subheadings; for those inputs whose prices varied across the POR, there was no persistent upward trend across the POR." *Id.* at 11, Appx1048. However, independent price data sources of steel products summarized in **Attachment 1** show that during the POR, steel prices trended up in Turkey while trending down in other global markets. These two diametrically opposite price trends are consistent with the hyperinflationary situation prevailing in Turkey and they also impeach the reliability of the stagnant Euro denominated steel prices as reported by the Turkish government. Thus, Commerce's findings are contradicted by all other steel price data reported in Turkey and other markets confirming that even Euro based GTA Turkey import data are distorted by severely depreciated exchange rates, which were restricted to half of the underreported inflation rates.

Seventh, Commerce improperly rejected Dingli's argument which relied on the Canadian government's particular market situation ("PMS") findings. Dingli Brief at 13-15, Appx2843-2845. Dingli Final SV Submission Exhibit TR-9F-1, Appx10825-10868. Dingli emphasized "the distortive influence of Russian steel billet pricing permeat{ing} through the entire Turkish domestic market steel sector and consequently distort{ing} prices of exports and imports of steel products." IDM at 11, Appx1048. Commerce unpersuasively claims an absence of precedent requiring that Commerce, in "determining the appropriate surrogate country," consider "another government's PMS findings . . . concerning a product and inputs thereto unrelated to the merchandise under investigation." *Id.* However, Commerce's selection of a primary SC is statutorily circumscribed by the "best available information" standard. 19 U.S.C. § 1516a(b)(1)(B)(i). Since the Canadian PMS findings regarding distorted prices of primary steel inputs (steel billets and steel scraps) are unrebutted relevant evidence on this record, Commerce cannot summarily reject their relevance to its decision in this case. Contrary to Commerce's claim, these PMS findings

do "provide a guidance in the conduct of this administrative review."

IDM at 10, Appx1047.

Further, Commerce proffers misguided reasoning that:

> Steel scrap is not a material input in the production of MAE . . . {w}hile steel billet is only one of numerous steel inputs in the production of MAE . . . {and it is unclear} whether steel billet, particularly of Russian origin, was also an upstream input in the production of numerous steel inputs in Türkiye for MAE, such as steel plate, steel rod, steel tube, various fabricated steel weldments.

IDM at 11, Appx1048.

Affirmative PMS findings imply that the distorted prices of Russian origin steel scrap / steel billet caused a price distortion of **all** steel scrap / billet in the Turkish market. Further, because steel scrap and steel billet are inputs used to produce secondary steel products, which, in turn, are utilized to produce MAE, the distorted prices of steel scrap / billet would have resulted in a distorted pricing of **all** secondary steel inputs in the Turkish domestic market. Next, due to a dynamic equilibrium between domestic and import prices, Turkish import prices of **all** primary and secondary steel inputs would have been likewise distorted, resulting in a distorted NV of MAE.

Accordingly, it is irrelevant whether there is evidence on this record that Russian origin steel billets were used in the production of MAE, or that "Commerce excludes exports from Russia in calculating Turkish import AUVs" or "the relatively small share of Russian imports of steel into Türkiye." *Id.* In fact, Turkish domestic prices of **all** steel scrap / billets and consequently **all** secondary steel inputs were distorted by PMS that, in turn, distorted the import prices of **all** primary and secondary steel inputs. Therefore, the Russian imports' small share or their exclusion in AUV computation or their arguable non-use in the production of MAE in Turkey do not negate the conclusion in the PMS decision that the prices of all other imported steel products used for calculation of the AUVs were distorted.

In sum, Commerce's claims that Turkish import data of steel inputs are undistorted by hyperinflation, suppressed exchange rate and PMS are unsupported by substantial evidence.

### C. Turkish Financial Statements are Distorted by Hyperinflation and Countervailable Subsidies

Commerce's selection of Turkey as the primary SC is also undermined by its improper rejection of arguments confirming that the

two Turkish financial statements – Tümosan Motor ve Traktör Sanayi A.Ş. ("Tumosan") and Türk Traktör Ve Ziraat Makineleri A.Ş. ("Turk Traktor") – are distorted by hyperinflation, and that the Tumosan financial statement is also distorted by countervailable subsidies.

#### 1. Tumosan's and Turk Traktor's Expenses and Revenue are Distorted Because They are Not Adjusted for Hyperinflation

Dingli established that the financial statements of Tumosan and Turk Traktor are distorted and unreliable, absent their hyperinflation adjustments. Dingli Brief at 16-20, Appx2846-2850. As set forth below, Commerce's response is unsupported by substantial record evidence.

First, Commerce claims that the 2022 financial statements of "Tumosan Traktor and Turk Traktor, are {not} distorted and unreliable, due to a lack of an adjustment for inflation," reasoning that "the decision by the Turkish accounting and auditing standards authority makes it clear that . . . it was not necessary to adjust for inflation the financial information for fiscal year 2022." IDM at 13-14, Appx1050-1051. This rationale is flawed. The issue here is not whether the inflation-unadjusted Turkish financial statements technically violate the Turkish Financial Reporting Standards. Rather, the issue is

whether the absence of inflation adjustment of the Turkish financial statements constitutes substantial evidence that the quality of the Turkish financial statements is inferior to the quality of the Bulgarian financial statements for purposes of Commerce's primary SC selection.

Moreover, the inflation-distorted data reported in the financial statements remain inaccurate even if the three years cumulative Turkish CPI is 74.41%, as officially reported, because it amounts to an extremely high level of inflation. IDM at 13, Appx1050. For the three-year period ending March 2022, the CPI and PPI for Turkey was much higher – exceeding the 100% threshold. Dingli Brief at 16, Appx2846; Dingli Final SV Submission Exhibits TR-9C-1–2, Appx10346-10366. Accordingly, inflation adjustment was required under international financial reporting standards IAS 29 and the corresponding Article 298 of the Turkish Tax Procedural Law. Dingli Brief at 16, Appx2846; Dingli Final SV Submission Exhibits TR-9A-4, TR-9D-1–2, TR-9D-5, TR-9D-7–8, DTR-9F-1, Appx10319-10331, Appx10595-10623, Appx10639-10651, Appx10658-10710,Appx10825-10868. As such, the unadjusted revenue and expense reported in Turkish financial statements are inaccurate and significantly distorted, considering

either three-year official CPI index – 74.41% – or the actual rate of over 100%.

Second, record evidence contradicts Commerce's claim of an "absence of record evidence . . . that . . . Turkish companies' financial performance {were} materially compromised by a lack of an inflation adjustment." IDM at 14, Appx1051. The following economic studies on the record establish that these financial data were unreliable without an inflation-adjustment:

- "The phenomenon of inflation . . . has **negative effects on the objectivity of accounting data and information**, through a decrease in the purchasing power of the monetary unit of measurement, which shows the historical cost deficiency in the evaluation, addressing that negative impact on the values of financial statements and financial reports in general." Dingli Final SV Submission Exhibit TR-9D-5: O. Tamini & I. Orban, *Hyperinflation and Its Impact on the Financial Results*, 14(2) INTELLECTUAL ECONOMICS 5-16 (2020), at 6 (emphasis added), Appx10641.

- "Hyperinflation has several effects on the financial results of the companies based on the data analyzed . . . . Hyperinflation leads to higher production costs and then the impact of this is reflected in raising the selling prices of products, which makes the **accounting profit misleading and does not reflect the real profit for the financial period**, which leads to misleading tax, the distribution of imaginary profit shares, and then its negative impact on the productivity of the company." *Id.* at 13 (emphasis added), Appx10648.

- "Due to market fluctuations, **financial statements do not represent an entity's real status during an inflationary period**." *Id.* Exhibit TR-9D-7: S. Selimefendigil, *Decision Usefulness and Inflation Accounting: The Case of Turkey*, 25(4) MUHASEBE BILIM DUNYASI DERGISI 465-97, 486 (2023) (emphasis added), Appx10680.

- "Using a long series of annually and quarterly accounting data from 2000 to 2022, it is documented that **financial information derived from financial statements deteriorates during high inflationary periods**. *Id.* at 488 (emphasis added), Appx10682.

The *Final Results* unlawfully failed to address the above arguments.

Third, Commerce wrongly claims to presumptively "afford{} a limited weight to an expert's opinion prepared for the express purpose of submission in this review, as there is an inherent risk of fabrication, exaggeration, and/or bias." IDM at 14, Appx1051. It improperly discounts Mr. Reinsdorf's impeccable credentials:

> a former senior economist in the IMF Statistics Department, a former chief of the national economic research group at the Bureau of Economic Analysis, and a past president of the International Association for Research in Income and Wealth . . . {who} received the 2021 Julius Shiskin Memorial Award for outstanding contributions to Economic Statistics.

Dingli Final SV Submission Exhibit TR-9B-1 at 1, Appx10334.

Commerce erred by overlooking the fact that the Reinsdorf Opinion is based on established econometric methodologies and draws

from objective, unrebutted sources. Commerce's established policy is to consider the contents of expert opinions and how they "relate{} to the academic literature on this topic," and to give weight to such opinions "to the extent they are consistent with lexigraphic and other reliable sources." *Passenger Vehicle and Light Truck Tires from the Republic of Korea*, 90 Fed. Reg. 19,673 (May 9, 2025) (final results), ("*PVLT from China*"), IDM Comment 1; *see Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China,* 87 Fed. Reg. 38,379 (June 28, 2022) (final determination), IDM Comment 9 (relying for air freight SV data based on an air freight industry expert's opinion). As such, Commerce's disparagement of the high-quality Reinsdorf Opinion – without carefully considering whether the opinion "relate{} to the academic literature on this topic," and was "consistent with lexigraphic and other reliable sources," *PVLT from China,* 90 Fed. Reg. 19,673, IDM Comment 1 – contradicted its own established practice and accordingly was unlawful.

Fourth, record evidence refutes Commerce's claim that "Dingli makes no connection between the specific accounting valuations deemed in the Reinsdorf's Opinion as allegedly contributory to distortions in

profit, on account of inflation, and the valuation methodologies actually used by Tumosan Traktor and Turk Traktor." IDM at 14, Appx1051. For example, both Tumosan and Turk Traktor's reporting reflect the distortive valuation methodology, "depreciation of expenses based on book values not reflective of replacement values." *Id.*

- Tumosan – Note 2.5(b)(i) suggests that depreciation expenses are based on old book values: "Excluding those recorded by the Group's valuation method, tangible fixed assets purchased before January 1, 2005, are shown at a cost value by deducting the accumulated depreciation and permanent depreciation losses from the cost value adjusted for the effects of inflation as of 31 December 2004; the assets purchased as of January 1, 2005 are reflected by deducting the accumulated depreciation and permanent value losses from the cost values." Dingli Final SV Comments Exhibit TR-10B at 20, Appx11214.

- Turk Traktor – Note 2.4 Property, Plant, and Equipment likewise shows that depreciation expenses are based on old book values: "Property, plant and equipment acquired before 1 January 2005 are carried at cost in purchasing power of TRY as at 31 December 2004 less accumulated depreciation and impairment losses. Property, plant and equipment acquired after 1 January 2005 are carried at cost less accumulated depreciation and impairment losses." *Id.* Exhibit TR-11 at 179, Appx11852.

In conclusion, such depreciation methodology in their financial statements is demonstrably distortive because they are based on

initially booked values of goods and were not adjusted for hyperinflation.

Fifth, Commerce incorrectly asserts that "Dingli hypothesizes that the distortions in profits of the Turkish companies may be present but fails to provide any analysis, using these companies' financial data, to validate its assertions." IDM at 14, Appx1051. This finding is wrong. Dingli established that there was an abnormal surge in "Tumosan's 2022 'profit before tax' of (702,553,846), approximately 10 times higher than its 2021 profit of 70,133,018." Dingli Brief at 19, Appx2849. Independent record evidence shows that such an abnormal profit surge is a direct consequence of hyperinflation, and Commerce fails to link it to any other factor on this record. Dingli Final SV Submission Exhibit TR-9D, Appx10594-10621, Appx10624-10631.

Sixth, Commerce misplaces reliance on *Metal Lockers and Parts Thereof from China*, 86 Fed. Reg. 35,737 (July 7, 2024) (final determination) ("*Metal Lockers*"). IDM at 15, Appx1052. There, "petitioners alleged that Ayes' financial statements may be distorted by significant inflation, and were submitted to the record without inflation adjustments, {but} the petitioners failed to provide specific evidence of

any such distortion." *Id.* Commerce claims that likewise, "Dingli fails to provide specific evidence of distortion in fiscal year 2022 profits of Tumosan Traktor and Turk Traktor." *Id.* This claim is directly contradicted by Tumosan's demonstrated 10-fold abnormal profit surge in 2022, which most likely resulted from hyperinflation. Further, as explained above, both Turk Traktor and Tumosan's financial statements reported depreciation of expenses based on book values, which are distortive in a hyperinflationary economy.

Therefore, unlike *Metal Lockers* that featured only general arguments on hyperinflation, the instant record ties hyperinflation distortions to the surrogate financial statement's reporting. Further, in *Metal Lockers,* hyperinflation concerns were outweighed by the fact that the alternative Mexican financial statement was "of a producer of non-comparable merchandise." *Metal Lockers,* 86 Fed. Reg. at 35,737, IDM Comment 1. In contrast, the alternative Bulgarian financial statement of Dimexlift Group AD ("Dimexlift"), represents the performance of a producer of comparable merchandise. IDM Comment 3, Appx1057-1063.

Further, the *Metal Lockers* statement "that hyperinflation is not one of the agency's considerations in selecting surrogate financial statements, much less {SCs}," IDM at 15, Appx1052, is not sufficient reason for this Court to reject Dingli's argument based on the record in this case. The record here contains substantial evidence of hyperinflation-induced distortion in the Turkish financial statement data. Moreover, the alternative Bulgarian financial statement of Dimexlift is undistorted and satisfies all other criteria, including a comparable production experience.

### 2. Tumosan's Financial Statement is Suspected to be Distorted by Countervailable Subsidies

Commerce further unlawfully selected Tumosan's financial statement despite Dingli's demonstration that, per controlling law and judicially approved agency practice, there is reason to believe or suspect that this statement is distorted by countervailable subsidies. Dingli Brief at 20-22, Appx2850-2852.

First, Commerce reasons that "Tumosan Traktor's 2022 financial statements do not name any subsidy programs from which it benefited during fiscal year 2022, nor list any subsidies received in any line item

of the financial statements or in the accompanying explanatory notes." IDM at 15, Appx1052. Commerce misconstrues the legal standard for determining subsidy distortion of a financial statement.

Congress expressly instructs Commerce to "avoid using any prices which it has **reason to believe or suspect** may be dumped or subsidized prices." Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100-576, at 590 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623-24 (emphasis added). Thus, Commerce was only required to determine if there was a reason to believe or suspect that Tumosan's financial statement was distorted by subsidies. As this Court has held:

> Ignoring evidence that a company has been the beneficiary of a subsidy program previously found to be countervailable unless the proof appears on the face of the company's financial statement arguably guts Congress' "reason to believe or suspect" standard, by reading the phrase "or suspect" right out of it."

*Shenzhen Xinboda Indus. Co.*, 976 F. Supp. 2d at 1374.

Further, Commerce's analysis is not limited to the four corners of the financial statement – but instead includes all record evidence showing that a company potentially benefitted from a subsidy program. *Id.* at 1368. Independent record evidence, including a consultant's

declaration, constitutes substantial evidence that there is a "reason to suspect" that Tumosan may have benefitted from two countervailable subsidy programs: (a) Exemptions on Exchange Tax for Foreign Exchange Transactions ("ETFET"); and (b) Exemptions on Banking and Insurance Transaction Tax ("BITT"). Dingli Final SV Submission Exhibit TR-10C, Appx11265-11286, Appx11399, Appx11637.

Commerce raised no evidentiary concerns with the evidence showing that Tumosan likely received countervailable subsidies. Instead, it focused its inquiry on whether the record contained conclusive evidence confirming that Tumosan's received subsidies under the two programs which were expressly reported in its statement. Commerce overlooked that unlike certain direct subsidies (*e.g.*, receipt of grants) that often are reported as line items or notes, indirect subsidies such as ETFET and BITT (arising from exemptions from taxes, duties, etc., resulting in reductions in costs) are not normally reported in this manner. Thus, mere absence of an express reference to the two tax exemption programs in Tumosan's financial statement is insufficient to find that it was undistorted by subsidies, in light of

substantial record evidence to support a "reason to suspect" that subsidies could have been received – the Congressional directive.

Commerce ignored Dingli's subsidy analysis conforming to the three-part test recognized by this Court in *Fuyao Glass Indus. Grp. Co. v. United States*, whether:

> (1) subsidies of the industry in question existed in the supplier countries during the period of investigation . . . ;
>
> (2) the supplier in question is a member of the subsidized industry or otherwise could have taken advantage of any available subsidies; and
>
> (3) it would have been unnatural for a supplier to not have taken advantage of such subsidies.

29 CIT 109, 114 (2005).

Based on Commerce's recent Turkish ADD determinations and a consultant's declaration, Dingli established that ETFET and BITT subsidy programs existed during the POR and that Tumosan – as a member of three exporter's associations and holder of an industrial registry certificate – was eligible to receive those subsidy benefits. Dingli Brief at 20-21, Appx2850-2851. Absent evidence to the contrary, under the "reason to suspect" evidentiary standard, Commerce was required to reject Tumosan's financial statement. Commerce's rationale,

therefore, directly contradicted "the 'reason to believe or suspect' standard {which establishes} a relatively 'low threshold'—less demanding than {Commerce} suggests, and clearly less rigorous than required for an actual finding of subsidies in fact." *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 31 CIT 159, 168-69 (2007).

Second, Commerce advances a meritless *de minimis* subsidization rationale: "any distortion would be miniscule . . . because Tumosan Traktor's 2022 financial statements confirm that its 2022 revenue, derived from 'overseas transactions' represents a mere 1.6 percent of the total gross revenue." IDM at 16, Appx1053. Such reasoning was rejected in *Peer Bearing Co.-Changshan v. United States*:

> CPZ contends that these subsidies are *de minimus* and, therefore, do not support Commerce's decision to reject the actual prices paid. The level of subsidization does not prevent Commerce from determining that it has "reason to believe or suspect" that prices paid are subsidized. Any level of subsidization found in the exporting country is enough evidence to support a determination that Commerce has "reason to believe or suspect" that prices are distorted. The Court finds that Commerce made a logical inference that CPZ's supplier may have benefitted from the generally available subsidies.

27 CIT 1763, 1772 (2003).

In sum, Commerce's use of Tumosan's financial statement is unsupported by substantial evidence.

### D. Commerce Improperly Rejected Bulgaria Based on Deficiencies that Are Minor Relative to the Unreliability of Turkey's Data

Commerce resorted to a disjunctive analysis citing minor deficiencies to reject Bulgaria, while selecting Turkey as the primary surrogate country – notwithstanding major critical deficiencies rendering the Turkish data unreliable. Sections I.B-C, *supra*. First, Commerce reasons that "Dingli failed to provide calculated inflators, based on Bulgarian overall PPI, . . . {while} the record contained readily available Turkish PPI inflators, with which to inflate the 2020 data for movement expenses . . . {that} inform{ed} Commerce's decision in the consideration of the primary surrogate country." IDM at 22, Appx1059. However, since movement expenses are not major FOPs, under Commerce's practice, the mere absence of the Bulgarian PPI data does not support rejection of Bulgaria as a primary SC choice.

Second, Commerce improperly rejected Dimexlift's financial statement based on the absence of an Annex. It claims that "without the explanatory notes, Commerce can neither determine . . . whether the

breakout of expenses, solely based on information in the income statement, is sufficient." IDM at 23, Appx1060. This contention is refuted by Dingli's demonstration, which was not addressed by Commerce in its IDM, that the financial statement breaks out expenses for all "vital" cost and expense categories:

(i) raw materials and energy – "raw materials and supplies"

(ii) labor – "staff costs"

(iii) overheads – "depreciation, amortisation and impairment of tangible and intangible fixed assets, including - depreciation expense"

(iv) trading goods cost – "carrying amount of assets sold"

(v) selling, general, and administrative expenses ("SG&A") – "Interest expense and other financial expenses"

Dingli Brief at 27, Appx2857.

Further, Commerce relies on distinguishable precedents. IDM at 24 nn.106-07, Appx1061. In *Steel Wire Garment Hangers from China*, "because there are alternative sources available on the record that do not have these deficiencies, . . . these financial statements are not the best available information on the record." 76 Fed. Reg. 27,994 (May 13, 2011) (final results), IDM Comment 2. In contrast, the alternative

Turkish financial statements are distorted by hyperinflation and countervailable subsidies. In *Silicomanganese from Kazakhstan*, unlike the Dimexlift financial statement, "the Sinai data d{id} not have any auditor's statement . . . {was} only four pages long, . . . unable to locate . . . several of the SG & A expense figures." 67 Fed. Reg. 15,535 (Apr. 2, 2002) (final determination), IDM Comment 3. In contrast, the Dimexlift financial statement is fifteen pages, has an auditor's statement, and lists three individual SG&A expenses besides expenses under all other accounting categories.

Commerce's subsidiary rationale for alleged data deficiencies is likewise unsupported. Contrary to Commerce's speculation that Dingli blindly classifies a portion of Dimexlift's "other expenses" under SG&A, IDM at 23, allocating residual "other expenses" – 18,000 BG – to the broad basket category SG&A accords with Commerce's normal practice in ratio calculations. Dingli Brief at 28, Appx2858. Moreover, this amount constitutes merely 7% of the total SG&A amount of 242,000 BG, *i.e.*, it accounts for 7% of the 8.93% SG&A ratio, *i.e.*, 0.6% out of 8.93%. *Id.* As such, this allocation, besides being reasonable, has an insignificant effect on the overall ratios.

Likewise, Commerce's speculation "whether the 2022 'other revenue' line item in Dimexlift's income statement reflects company's normal business operations" IDM at 23, Appx1060, is baseless absent record evidence that Dimexlift is engaged in a separate financing business, such as investment activities that would be considered as a separate line of business. Moreover, absent contrary evidence, Commerce's standard practice is to consider "other income" as related to the "general operations of the company." *Steel Wire Garment Hangers from China*, 83 Fed. Reg. 53,449 (Oct. 23, 2018) (final results), IDM Comment 1.

Commerce also asserts that "profitability attributable solely to 'other income' renders a financial statement unusable." IDM at 24 n.104 (citing *Glycine from China*, 74 Fed. Reg. 41,121 (Aug. 14, 2009) (final results), IDM Comment 1), Appx1061. However, the cited 2009 precedent is an outlier because Commerce's current practice is to not reject financial statements in such cases because "other income," absent contrary evidence, is deemed to arise from the general operations of the company, and accordingly does not offset the reported profit before tax.

In 2010, one year after the *Glycine* decision, Commerce in *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam* decided the identical issue as follows:

> An examination of the 2008-2009 Apex financial statement shows that it had an operating loss which was offset by "Other Income," resulting in a positive "Profit Before Tax." The Petitioner has argued that because this "other income" was based on activities unrelated to Apex's primary operations, the Department should adjust Apex's profit to be negative, and thus, not use the 2008-2009 financial statement in the calculation of surrogate financial ratios. . . . because we cannot determine whether Apex's "other income" is long-or short-term, for the final results, we have made no offset to profit for "other income."

75 Fed. Reg. 47,771 (Aug. 9, 2010) (final results), IDM Comment 3C.

Commerce has followed this approach ever since. Notably, Commerce in *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from China*, held as follows.

> The Department disagrees with Petitioners that record evidence indicates that the other income line item (miscellaneous receipts) in Lloyds' financial statement is a non-operating income item. We do not find that there is a reason to deduct this line item from Lloyds' financial statement. Therefore, without deducting these miscellaneous receipts line item from profit, Lloyds made a profit in the fiscal year.

75 Fed. Reg. 57,449 (Sept. 21, 2010) (final determination), IDM Comment 6.

These decisions undermine Commerce's rationale to reject Dimexlift's financial statement based on the profit generating "other income" line item.

Third, Commerce improperly rejected the financial statement of another Bulgarian producer, Balkancar-Ruen AD ("Balkancar"), based on it allegedly lacking comparable production experience and an auditor's report. IDM at 24, Appx1061. Commerce ignored record evidence in finding "that this company does not produce subassemblies as contemplated by the scope . . . . {R}ather, they reflect the experience of one of Dingli's parts suppliers." *Id.* at 25, Appx1062. Yet the record for Balkancar evidences:

- "Its main activity is: **production**, trade, service and repair **of trucks and other lifting and transport equipment**, as well as components for them." Dingli Final SV Submission Exhibit BG-11A (2022 Report at 1, Annexes at 1) (emphases added), Appx7106, Appx7114;

- "Its *main raw materials* include: 'Steel'; 'Forgings and castings'; and 'Cylinders.'" *Id.* (2022 Report Annexes at 13), Appx7126.

Thus, contrary to Commerce's findings, Balkancar's production experiences – as a producer of trucks and other lifting and transport equipment utilizing steel inputs, cylinders, etc. – mirrors those of the other three surrogate companies, Tumosan, Turk Traktor, and Dimexlift, determined to "produce products with functionalities similar to those of MAE." IDM at 24, Appx1061.

Commerce further incorrectly claims that "the product information that Dingli submitted on the record appears to pertain to a different company within the Balkancar group of companies." *Id.* at 25, Appx1062. In fact, the record provides product information for Balkancar as follows: "BALKANCAR . . . in Assenovgrad supplied other factories with chassis units . . . , being a specialized member of the Bulgarian industrial truck family . . . started supplying all industrial truck assembly plants." Dingli Final SV Submission Exhibit BG-11A (Balkancar Company Information, Plants at 3), Appx7200. Chassis units are subassemblies akin to MAE subassemblies, thereby disproving Commerce's finding that Balkancar's financial doesn't represent comparable production experiences.

Commerce next improperly disqualified Balkancar's financial statement as "they do not contain a valid auditor's opinion" IDM at 26, Appx1063. This rationale is contrary to agency precedent upon which Commerce relies. In *Circular Welded Carbon-Quality Steel Pipe from China*, "while Spark Electrodes financial statements {we}re signed by an auditor, there {wa}s no auditor's opinion." 81 Fed. Reg. 75,042 (Oct. 21, 2016) (final determination), IDM Comment 1. This precedent is distinguishable because unlike Spark Electrodes, it is undisputed that "Balkancar was not required to submit audited financial statements to the Bulgarian government, due to its size." IDM at 25-26, Appx1062-1063. Likewise, *Certain Glass Containers from China* is distinguishable because there was no evidence in that case that "DCS' financial statements lack an auditor's opinion" only because they were not required to have one. 85 Fed. Reg. 58,333 (Sept. 11, 2020) (final determination), IDM Comment 1.

Conversely, Commerce's judicially approved decision to use an otherwise suitable financial, albeit lacking an auditor's report, supports the use of Balkancar's financial statement. *See Aluminum Foil from China*, 88 Fed. Reg. 76,734 (Nov. 7, 2023), IDM Comment 1, *aff'd*

*Jiangsu Dingsheng New Materials Joint-Stock Co.*, 2025 WL 2092386 at*3-5.

Therefore, Commerce's decision to reject Balkancar's financial statement is unsupported by record evidence and established precedent. Commerce erroneously found that "Bulgaria does not afford Commerce with two high-quality sets of financial statements for producers of merchandise comparable to MAE." IDM at 26, Appx1063. In fact, examination of "the record does . . . support that Bulgaria offers the best choice for the primary {SC}." *Id.*

In sum, Commerce's decision to reject Bulgaria notwithstanding its superior quality SV data in favor of hyperinflation and subsidy-distorted Turkish SV data is unlawful and unsupported by substantial record evidence.

## II. COMMERCE UNLAWFULLY USED COHEN'S *d*

In *Marmen Inc. v. United States*, the CAFC held that it is unreasonable for Commerce "to rely on {the} Cohen's *d* test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous" 134 F.4th 1334, 1348 (Fed. Cir. 2025). The CAFC reasoned

that when those statistical assumptions are not satisfied the "Cohen's *d* test cannot be used . . . to determine 'a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or period of time.'" *Id.* (citing 19 U.S.C. § 1677f-1(d)(1)(B)). As a result, the CAFC vacated "Commerce's calculated dumping margin based on the unreasonably use of {the} Cohen's *d* test to justify the {average-to-transaction} methodology," and ordered Commerce to reconduct its differential pricing analysis without relying on the Cohen's *d* test. *Id.*

As a result of this decision, this Court should order remand for Commerce to recalculate Dingli's margin without using the invalidated Cohen's *d* test.

## III. COMMERCE UNLAWFULLY DEDUCTED SECTION 301 DUTIES FROM DINGLI'S U.S. SALES PRICES

During the POR, Dingli sold merchandise to unaffiliated U.S. customers that was subject to Section 301 duties, which Dingli reported in its U.S. sales database. CQR Exhibit C-1, Appx1173-1182. In the *Final Results*, however, Commerce categorized these duties as "U.S.

Import Duties" and deducted them from Dingli's U.S. sales prices. IDM Comment 10, Appx1082.

Although this Court has held that Section 301 duties are "U.S. Import duties" and thus deductible from U.S. sales prices, those cases are either on appeal or still pending. *Shanghai Tainai Bearing Co. v. United States,* No. 23-20, 2024 WL 5154030 (CIT Dec. 18, 2024); *Shanghai Tainai Bearing Co. v. United States,* 2024 WL 5154032 (CIT Dec. 18, 2024), *appeal pending*, Fed. Cir. No. 25-1405 (docketed Jan. 31, 2025); *Jinko Solar Import and Export Co. v. United States*, 701 F. Supp. 3d 1367 (CIT 2024), *remand pending*; *Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp. 3d 1354 (CIT 2024), *remand pending*. For the reasons below, Dingli respectfully disagrees with these decisions and requests that this Court find that Section 301 duties are special duties and therefore are not deductible from Dingli's U.S. sales prices.

**A. Section 301 Duties are Not "U.S. Import Duties"**

After an investigation of "China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation" under Section 301 of the Trade Act of 1974, the President

directed the United States Trade Representative ("USTR") to take certain actions towards China, including imposing additional duties on certain imports from China ("Section 301 duties"). *See Presidential Memorandum on the Actions by the United States Related to the Section 301 Investigation* (Mar. 22, 2018),[2] For shipments entered on and after July 6, 2018, the USTR instructed Customs to collect Section 301 duties on multiple products, including certain MAE machines. *See Notice of Action and Request for Public Comment concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (June 20, 2018). These Section 301 Duties were in effect during the POR.

Per the statute, Commerce is required to decrease an exporter's export price ("EP") or constructed export price ("CEP") by the amount of "any additional costs, charges, or expenses and United States import duties" when calculating dumping margins. 19 U.S.C. § 1677a(c)(2)(A).

---

[2] https://trumpwhitehouse.archives.gov/presidential-actions/presidential-memorandum-actions-united-states-related-section-301-investigation/.

Here, Commerce treated the special Section 301 assessment as "United States import duties" and deducted Dingli's reported Section 301 Duties from its U.S. sales prices when calculating its dumping margin. IDM Comment 10.

However, the deduction of Section 301 duties is not consistent with Commerce's legal framework established in *Stainless Steel Wire Rod from Korea*, which the CAFC affirmed*. See Stainless Steel Wire Rod from Korea,* 69 Fed. Reg. 19,153 (Apr. 12, 2004) (final results); *Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007). Further, treating Section 301 duties as "United States import duties" when calculating the dumping margin is arbitrary and capricious. On remand, Commerce should not deduct 301 duties from U.S. sales prices when calculating Dingli's ADD margin.

### B. Section 301 Duties are "Special Duties" and Should Not Be Deducted from the U.S. Sales Price

The legal framework established in *Stainless Steel Wire Rod from Korea* is instructive for determining whether to treat Section 301 duties as U.S. import duties when calculating Dingli's ADD margin. 69 Fed. Reg. at 19,154-56.

Because the ADD statute does not expressly define the term "United States import duties," Commerce should consider the statute's legislative history in its analysis of Section 301 duties, like it did when it analyzed Section 201 duties in *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. at 19,154-56; and *Wheatland Tube*, 495 F.3d at 1360-61 (affirming that the ADD statute is ambiguous as to what constitutes import duties because "it is clear that Congress has not defined or explained the meaning or scope of 'United States import duties' as set forth in 19 U.S.C. § 1677a(c)(2)(A)."). Per this legislative history, Section 301 duties are assessed to remedy "foreign unfair practices," and thus should not be characterized as normal duties:

> Since it was enacted, section 301 has been the principal U.S. statute **for addressing foreign unfair practices that adversely affect U.S. exports of goods and services**. Section 301 authorizes the Trade Representative to take action, subject to the direction of the President, against acts, policies, or practices that are inconsistent with, or deny benefits under, trade agreements or that are unreasonable, unjustifiable, or discriminatory and burden or restrict U.S. commerce.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1 ("SAA"), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4318-19 (emphasis added).

Section 301 duties assessed on imports from China are designed to "obtain the elimination of" acts, policies, and practices of the Government of China ("GOC") covered in the Section 301 duty investigation; thus, they are remedial and not normal import duties. 83 Fed. Reg. at 28,711. In contrast, normal customs duties are those imposed on Chinese imports in the same manner as they are on imports from other countries, without consideration of specific unfair practices of the GOC. *Wheatland Tube*, 495 F.3d at 1361.

In *Stainless Steel Wire Rod from Korea*, Commerce compared Section 201 duties to normal customs duties and antidumping duties, and determined that Section 201 duties are special duties that should not be deducted from U.S. sales prices:

> Like AD duties, 201 duties are special remedial duties. Section 201 duties represent the amount that the President determines is needed to provide "temporary relief for an industry suffering from serious injury{.}". . . Nevertheless, 201 duties are special remedial measures. Although they are not identical to AD duties, they are more like them in purpose and function than they are like ordinary customs duties . . . .

69 Fed. Reg. at 19,154-56, 19,157-61.

Like Section 201 duties, Section 301 duties are remedial. *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1332 (CIT 2022). The statute that authorizes the USTR to impose Section 301 duties clearly specifies that these duties remedy unfair conduct of a foreign government as it relates to imports:

> If the Trade Representative determines . . . that
>
> (1) an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and
>
> (2) action by the United States is appropriate, **the Trade Representative shall take all appropriate and feasible action** authorized under subsection (c), subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to **obtain the elimination of that act, policy, or practice**. Actions may be taken that are within the power of the President **with respect to trade in any goods or services**, or with respect to any other area of pertinent relations with the foreign country.

19 U.S.C. § 2411(b) (emphasis added).

Section 301 duties, like "special" AD and Section 201 duties, are imposed only after certain findings are made. *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. 19,159-60; 19 U.S.C. § 2411(b). Specifically, for ADD rates to be assessed, Commerce must make an affirmative

determination of dumping. 19 U.S.C. § 1673. Likewise, for Section 201 duties to be assessed, the International Trade Commission must first find that these imports are a substantial cause of serious injury, or pose threat thereof, to the U.S. industry. *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. at 19,159 ("Unlike normal customs duties, 201 duties are imposed only following a finding of serious injury to the industry in question by the International Trade Commission.").

Similarly, for Section 301 duties to be assessed, the USTR must find that U.S. rights have been violated by the foreign government under a trade agreement. 19 U.S.C. § 2411(b). The USTR investigated "China's laws, policies, practices, or actions that may be unreasonable or discriminatory and that may be harming American intellectual properties, innovation, or technology development," and found that "the acts, policies, and practices of the . . . {GOC} covered in the investigation are unreasonable or discretionary and burden or restrict U.S. commerce." *See Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83. Fed. Reg. 40,823 (Aug. 16, 2018). Based on these findings, the United States imposed Section 301 duties on

imports from China. Office of the U.S. Trade Rep., China Section 301 – Tariff Actions and Exclusions Process.[3] Therefore, Section 301 duties on imports from China are special duties.

Moreover, Section 301 duties, like Section 201 duties, are not normal customs duties contained in Chapters 1 through 98 of the Harmonized Tariff Schedule of the United States ("HTSUS"):

> That 201 duties are contained in the HTSUS proves only that this is a pragmatic way of implementing their collection along with other import duties. In any event, although 201 duties are set out in the HTSUS, they are contained in Chapter 99, which is reserved for special or temporary duties.

*Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. at 19,160. Like Section 201 duties, Section 301 duties are also contained in Chapter 99. *See* HTSUS Heading 9903.88.01 (imposing additional 25 percent Section 301 duties).

Thus, Section 301 duties, like ADDs and Section 201 duties, should be considered "special" rather than "U.S. Import" duties.

---

[3] https://ustr.gov/issue-areas/enforcement/section-301-investigations/tariff-actions

### C. Deducting 301 Duties Would Double-Count ADDs

As this Court has recognized, deducting special duties would lead to double-counting:

> In this context, making an additional deduction from USP for the same {ADDs} that correct this price discrimination would result in double counting. This is a reasonable explanation for Commerce's decision to exclude antidumping duties from its definition of "United States import duties" in this context. A similar explanation would apply to Commerce's refusal to deduct countervailing duties from United States Price

*AK Steel Corp. v. United States*, 988 F. Supp. 594, 607 (CIT 1998).

Likewise, in *Hoogovens Staal BV v. United States*, this Court held:

> If Commerce were to deduct existing antidumping duties as a matter of course in its administrative reviews, it would reduce the U.S. price – and increase the margin—artificially. As discussed earlier, an antidumping order is designed to raise the price of dumped goods to a fair level in the import market. It is not a normal import duty or an extra "cost" or "expense" to the importer—it is an element of a fair and reasonable price.

4 F. Supp. 2d 1213, 1220 (CIT 1998).

Similarly, Commerce refused to deduct Section 201 duties in *Stainless Steel Wire Rod from Korea*, explaining:

> {If} there is a pre-existing dumping margin, deducting 201 duties from U.S. prices effectively would collect the 201 duties twice—first as 201 duties, and a second time as an

> increase in that dumping margin. Where there was no preexisting dumping margin, the deduction of 201 duties from U.S. prices in an AD proceeding could create a margin. Nothing in the legislative history of section 201 or the AD law indicates that Congress intended such results.

69 Fed. Reg. at 19,159-60.

Here, deducting Section 301 duties from the U.S. sales price would likely result in double-counting duties, first as Section 301 duties, and a second time as an increase in that ADD margin, because Commerce determined dumping exists with respect to Dingli's sales. Therefore, on remand, Commerce should not deduct Section 301 duties when calculating Dingli's ADD margin.

### D. Deducting Section 301 Duties from U.S. Price is Contrary to Law, and Procedurally Defective

Finally, Commerce did not rely on its formal notice-and-comment rulemaking authority to determine whether Section 301 duties are "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A), departing from its prior practice of posting a notice requesting comments when dealing with similar tariffs. In the 2018-19 review of the ADD order on *Xanthan Gum from China*, Commerce eschewed the rulemaking authority to determine whether Section 301 duties are

United States import duties – instead conclusively and arbitrarily determining that:

> {A}s factual matter, Section 301 duties were imposed during the POR and, pursuant to the statute, **Commerce is bound to consider these normal U.S. import duties** in its dumping margin calculations. Any argument concerning the legality of the imposition of Section 301 duties is not properly raised before Commerce because Commerce is not the authority imposing these duties.

86 Fed. Reg. 16,189, (Mar. 26, 2021) (final results), IDM Comment 3 (emphasis added).

Commerce's rationale is specious. The fact that Section 301 duties were assessed on shipments entered during the POR does not mean that those duties were "bound to" be "normal U.S. import duties." *Id.* Under this circular logic, Commerce would have to treat ADD as "normal U.S. import duties" and deduct these imposed ADD from U.S. sales prices, because the ADDs were likewise imposed during the POR. In fact, Commerce specifically refuted the proposition that it should treat ADDs as "United States import duties:" *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. at 19,159.

Although the ADD law does not define the term "United States import duties," the Senate Report accompanying the Antidumping Act

of 1921 ("1921 Act") contrasts ADDs, which it refers to as "special dumping duties," with normal customs duties, which it refers to as "United States import duties." *Id.* Moreover, Section 211 of the 1921 Act provides that, for the limited purpose of duty drawbacks:

> the special dumping duties shall be treated in all respects as regular Customs duties. If special dumping duties normally were considered to be just one type of United States import duty, this special provision would have served no purpose.

*Id.* (internal quotations omitted).

Finally, a WTO panel has found that Section 301 duties imposed by the United States on List 1 and List 2 of products imported from China are unlawful. *See* Panel Report, United States — Tariff Measures On Certain Goods From China, WTO Doc. WT/DS543/R (adopted Sept. 15, 2020); *see also* 83 Fed. Reg. 28,710 (including MAE products in List 1). Specifically, the panel found that the additional *ad valorem* duties were *prima facie* inconsistent with:

(1) GATT Art. I: 1 (most favored nation treatment) because they applied only to products from China; and

(2) GATT Art. II because they were applied in excess of the rates to which the United States bound itself in its Schedule of Concessions.

WTO Doc. WT/DS543/R ¶ 7.86-87. Dingli is aware, as Commerce claims, that "WTO findings are not self-executing under U.S. law" – but Dingli nonetheless proffers this WTO report as persuasive, rather than binding, precedent. IDM Comment 10, Appx1081-1083.

In sum, Commerce should not have deducted these Section 301 duties from U.S. price. Deducting Section 301 duties would only compound the unlawful impact of Section 301 duties on this proceeding, including punishing Dingli by increasing its ADD margin. Accordingly, Dingli respectfully requests that on remand Commerce not deduct Section 301 duties from its U.S. Sales prices.

## CONCLUSION

For the aforementioned reasons, Plaintiff respectfully requests that this Court remand for Commerce to reconsider its *Final Results*.

Respectfully submitted,

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn
Mia F. Howard

*599 Lexington Ave.,
36th Floor
New York, New York 10022
**
1201 New York Ave., NW
Suite 650
Washington, D.C. 20005

*Counsel for Plaintiff Zhejiang Dingli Machinery Co., Ltd.*

Dated: August 12, 2025

# CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 12,780 words and an Attachment containing 1,152 words, making this brief less than the 14,000 word limit.

*/s/ Dharmendra N. Choudhary*
Dharmendra N. Choudhary

*Counsel for Plaintiff Zhejiang Dingli Machinery Co., Ltd.*

Dated: August 12, 2025

# Attachment 1




**Global Prices found by averaging the steel import prices from Bulgaria, Malaysia, and Romania in USD**

Source: Dingli Final SV Submission (March 27, 2024) Exhibit TR-9C-5 and Exhibit TR-9G-2




Source: Dingli Final SV Submission (March 27, 2024) Exhibit TR-9C-5 and Exhibit TR-9G-2

**India**










Source: Dingli Final SV Submission (March 27, 2024) Exhibit TR-9C-5 and Exhibit TR-9G-2

**Bulgaria**




Source: Dingli Final SV Submission (March 27, 2024) Exhibit TR-9C-5 and Exhibit TR-9G-2

**Romania**




Source: Dingli Final SV Submission (March 27, 2024) Exhibit TR-9C-5 and Exhibit TR-9G-2

**Malaysia**




Source: Dingli Final SV Submission (March 27, 2024) Exhibit TR-9C-5 and Exhibit TR-9G-2