**Slip Op. 26-119**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

| |
|---|
| **Court No. 24-00219** |
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, |
| *Plaintiff*, |
| v. |
| UNITED STATES, |
| *Defendant*, |
| and |
| ZHEJIANG DINGLI MACHINERY CO., LTD., |
| *Defendant-Intervenor*. |
| **Court No. 24-00221** |
| ZHEJIANG DINGLI MACHINERY CO., LTD., |
| *Plaintiff*, |
| v. |
| UNITED STATES, |
| *Defendant*, |
| and |
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, |
| *Defendant-Intervenor*. |

Before: M. Miller Baker, Judge

**OPINION**

[Sustaining the Department of Commerce's determination in two actions.]

Dated: September 23, 2026

*Timothy C. Brightbill*, *Laura El-Sabaawi*, *Enbar Toledano*, and *Theodore P. Brackemyre*, Wiley Rein LLP, Washington, DC, on the briefs for the Coalition of American Manufacturers of Mobile Access Equipment, plaintiff in Case 24-219 and defendant-intervenor in Case 24-221.

*Ned H. Marshak*, *Dharmendra N. Choudhary*, and *Jordan C. Kahn*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, New York, NY, on the briefs for Zhejiang Dingli Machinery Co., Ltd., plaintiff in Case 24-221 and defendant-intervenor in Case 24-219.

*Kristin E. Olson*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the briefs for Defendant. Of counsel for Defendant was *Charlie Chung*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Baker*, Judge: The Department of Commerce's imposition of an antidumping duty is but the first step in a sometimes decades-long cycle of administrative reviews in which the agency determines the actual rates

for the preceding 12-month period.[1] These two cases involve the first such review of an antidumping order on mobile access equipment imported from China.[2]

In Case 24-221, Zhejiang Dingli Machinery Co., Ltd. (Dingli), a Chinese producer, challenges the Department's choice of a primary surrogate country for valuing inputs and asserts that the agency committed certain legal errors. In Case 24-219, the Coalition of American Manufacturers of Mobile Access Equipment, a group of domestic producers, takes issue with how Commerce valued various inputs, including its use of a secondary surrogate country.

---

[1] *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1332 n.4 (CIT 2020) ("On the anniversary of an antidumping order, various affected parties (e.g., foreign producers and exporters and domestic competitors) may request an 'administrative review' to determine the actual assessment rates as to particular subject merchandise for the preceding twelve-month period. In short, each review is distinct, factually and legally, from any preceding review(s) and is best understood as periodic maintenance of the original antidumping order.").

[2] *See also Coal. of Am. Mfrs. of Mobile Access Equip. v. United States*, Slip Op. 24-66, 2024 WL 2796654 (CIT 2024) (*Mobile Access I*) (partially sustaining and partially remanding Commerce's original determination imposing the antidumping order); *Coal. of Am. Mfrs. of Mobile Access Equip. v. United States*, Slip Op. 25-150, 2025 WL 3555132 (CIT 2025) (*Mobile Access II*) (sustaining the Department's redetermination following remand).

Finding the Department's determination supported by substantial evidence and otherwise in accordance with law, the court sustains it in both cases.

I

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), the Coalition and Dingli filed their respective suits under 19 U.S.C. § 1516a(a)(2)(B)(iii) to attack different aspects of Commerce's final decision. Each then intervened in the other's case, essentially theorizing that the opponent's desired relief would only make matters worse. Caught in the crossfire, the government urges the court to sustain the agency determination as-is.

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if Commerce makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The court also reviews to ensure the agency engaged in "reasoned decisionmaking," meaning its result must be "within the scope" of its authority and "the process" it uses to reach that outcome "must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). The agency must "examine the relevant data and articulate a satisfactory explanation . . . including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). But courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

II

A

Under the Tariff Act of 1930, as amended, an antidumping duty represents the amount by which subject merchandise's "normal value" exceeds its "export price," i.e., the U.S. price. 19 U.S.C. § 1673. Usually, "normal value" is "the price at which the foreign like product is first sold . . . for consumption in the exporting country." *Id.* § 1677b(a)(1)(B)(i).

But an exception applies when the goods come from a nonmarket-economy country[3] like China. In such cases, the Department must assume that home-market sales are not reliable indicators of normal value because the economy is presumed to be under state control. *See, e.g.*, *Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093, 1105 (CIT 2009).

Instead, the statute instructs Commerce to determine normal value from "the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1). The calculation of their worth must "be based on the best available information regarding . . . such factors in a market economy country or countries considered to be appropriate by" the agency. *Id.*

The market-economy proxies the Department uses are known as "surrogate values." In choosing them, "Commerce 'attempts to construct a hypothetical market value of [the subject merchandise] in the [nonmarket-economy country].'" *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1330 (Fed. Cir. 2020) (first alteration in original) (quoting *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 (Fed. Cir. 2015)).

Here, Commerce found that *both* Turkey and Bulgaria provided the best available information overall—for some inputs, Turkey provided the best figures, but

---

[3] This term means "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." *Id.* § 1677(18)(A).

for others Bulgaria's were superior. Appx1014–1015. It chose the former country as the primary surrogate for two reasons.

First, the Bulgarian data for domestic movement expenses came from 2020 and the record lacked "inflators"[4] the agency could use to adjust the amounts to reflect figures accurate for the period of review. The Turkish information, on the other hand, included the necessary inflators. Appx1015.

Second, the financial statement for Bulgarian company Dimexlift lacked explanatory material the Department considered necessary, while the two Turkish statements on the record were "detailed" and "comprehensive" and included the critical explanatory notes. Appx1016–1017. But because Turkish data were unavailable for some inputs, Commerce also selected Bulgaria as a "secondary surrogate country." Appx1017.

---

[4] This term refers to how Commerce adjusts prior years' data that are non-contemporaneous with the relevant period of review to reflect what the amounts would have been during that period. The agency uses an inflator when the record lacks contemporaneous figures. *See Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312, 1323 (CIT 2017). For example, it might use consumer price index data as a way to estimate the extent to which prices or costs would have changed from one year to the next. *See New Am. Keg v. United States*, Slip Op. 22-106, at 5–6, 2022 WL 4363320, at *2 (CIT 2022) (rejecting agency's unexplained use of Brazilian consumer price index information to adjust non-contemporaneous Mexican wage rates).

Dingli now attacks the selection of Turkey and argues that the agency should have chosen Bulgaria instead for everything.

1

The Department has "broad discretion to determine whether information is the best available because the statute does not define the term." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011). "This court's duty is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that [it] chose the best available information." *Id.* (cleaned up).

Dingli, however, wrongly asserts that "this Court must assert its independent judgment in deciding whether Commerce's methodology resulted in reliance on the 'best available information.'" Case 24-221, ECF 52, at 19 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 369–70, 400 (2024)). On reply, the company doubles down, arguing that "best available information" is a matter of statutory construction requiring the court to decide whether the agency actually chose the best available information. Case 24-221, ECF 49, at 4 (citing *Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*, 794 F. Supp. 3d 1334, 1342 (CIT 2025), which Dingli claims relied on *Loper Bright*).

The company's invocation of *Dingsheng* violates the chutzpah doctrine.[5] Contrary to Dingli's characterization, that decision quite rightly rejected the contention (advanced by the same counsel, *see* 794 F. Supp. 3d at 1337) that "the statutory requirement to select the 'best available information' somehow strips Commerce of any deference to its determination of this case," finding that argument "without merit." *Id.* at 1341. While a statutory term's *meaning* is a legal question, "the application of that term to the record is a factual determination for the agency. . . . Commerce's task is a mixed question of law and fact requiring it to apply the statutory term to the record information." *Id.* at 1342. "Thus, the Court reviews whether Commerce's selection of . . . the primary surrogate country, because its information is better than all other information available, is supported by substantial evidence, i.e., reasonable on this record." *Id.*

2

Dingli also takes issue with how Commerce weighed the Turkish versus the Bulgarian information. The company asserts that the former country's "hyperinflation is the single most important consideration on this record" and that the problems the Department found with the latter nation's data—a lack of movement inflators and unusable financial

---

[5] *See NTSF Seafoods Joint Stock Co. v. United States*, Slip Op. 22-38, at 11, 2022 WL 1375140, at **3–4 (CIT 2022) (citing *Marks v. Comm'r*, 947 F.2d 983, 986 (D.C. Cir. 1991), for the "'chutzpah' doctrine").

statements—"are significantly less important." Case 24-221, ECF 49, at 5.

It is not for the court to decide what consideration is "most important" or whether any factor is "significantly less important." Such questions are for the Department, as "the court may not reweigh the evidence or substitute its own judgment for that of the agency." *Usinor v. United States*, 342 F. Supp. 2d 1267, 1272 (CIT 2004).

Commerce did not contest Dingli's assertion that Turkey suffered from hyperinflation during the period of review. Rather, it disagreed that hyperinflation rendered the country's data unreliable. Appx1045.[6] The agency did acknowledge that import data reported in Turkish lira would be unreliable due to hyperinflation, but it disagreed that the same concern applied to figures reported in other currencies. Appx1046. And it said the Turkish data here were in euros. *Id.* (citing Appx12903–12929).[7]

Dingli argues that nothing in the record establishes that Turkish import prices were denominated in euros, arguing that "this reasoning is impeached by Trade Data Monitor [Turkey] import data that *are officially reported in Turkish Lira*." Case 24-221, ECF 49, at 6

---

[6] In so doing, the agency declined to rely on an expert economist opinion proffered by the company. *Id*. The Department explained that because counsel retained the expert, his neutrality was "suspect." *Id.*

[7] The cited pages support the agency's statement. *See* Appx12925 (table valuing factors of production in euros).

(emphasis in original). The Department, however, did not use that source. Instead, it used the Global Trade Atlas. Appx1026.

And while the company argues that the latter's figures are "originally reported" in lira, it cites no evidence supporting that contention. Instead, it argues that a statement to that effect in its agency brief "has not been challenged." Case 24-221, ECF 52, at 24 (citing Appx2840, which itself cited no evidence to support the statement either).

"Briefs," however, "are arguments, not evidence." *Morgenstern v. Burton*, 86 F.2d 341, 342 (CCPA 1936); *see also Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 595 (Fed. Cir. 1997) ("[A]rguments of counsel cannot take the place of evidence lacking in the record."). Dingli overlooks that the agency's decision is presumed to be correct unless the party challenging it proves otherwise. 28 U.S.C. § 2639(a)(1). Because the company cites no evidence contradicting the Department's finding that the Global Trade Atlas data were denominated in euros, that argument fails.[8]

Bizarrely, Dingli injects an argument about the *Canadian* government's antidumping investigation of Turkish rebar. Again citing only its own agency

---

[8] Similarly, Dingli argues that Commerce's finding that "inflation cannot automatically preclude the consideration of [Turkey] as a primary surrogate country," Case 24-221, ECF 52, at 21 (quoting Appx1044), "ignores a plethora of record evidence" purportedly linking hyperinflation to distortion in surrogate value data and financial statements, *id*. But it cites nothing to support that accusation.

briefing, it asserts that *Commerce* was involved in that foreign proceeding. *See* Case 24-221, ECF 52, at 25–26 (claiming that "de-dollarization of the Turkish economy . . . was recognized by *Commerce* in the Canadian AD investigation" and that "the record in this proceeding does not contain any information contradicting *Commerce's* factual findings in the Canadian investigation") (emphasis added). It is unclear what "findings" the company believes the *Department* made as part of a *foreign government's* investigation. In any event, Dingli ignores the agency's observation that the Canadian government applied its own law, not U.S. antidumping law, and compiled its own record. *See* Appx1047.

Commerce also pointed out that Dingli cited no precedent requiring consideration of a foreign government's findings, especially as to unrelated products and inputs. Appx1048. The company calls that statement "unpersuasive" and argues that the lack of any rebuttal to the Canadian findings means they are the "best available information." Case 24-221, ECF 52, at 31. But it should be obvious that the Department must apply *U.S. law* to analyze its own record. Commerce reasonably explained why it deemed the Canadian government's analysis irrelevant.

The Department's finding that hyperinflation did not render Turkey inappropriate as a primary surrogate country is supported by substantial evidence.

3

Dingli's next attack on the selection of Turkey as surrogate involves the financial statements the agency employed. "Commerce values certain factors of production, such as selling, general, and administrative expenses, factory overhead, and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319 (Fed. Cir. 2010). The Department uses multiple firms' statements, if possible, "to normalize any potential distortions that may arise from using the statements of a single producer." *NTSF Seafoods Joint Stock Co. v. United States*, 487 F. Supp. 3d 1310, 1318 (CIT 2020).

The Coalition provided financial statements for two Turkish companies, Tümosan and Türk Traktör.[9] Appx1015. Commerce found they produce goods comparable to mobile access equipment. Appx1016. Dingli submitted statements from five Bulgarian firms, but the agency found that only one—Dimexlift Group AD—produced similar merchandise. *Id.* That issue mattered for determining whether the companies are likely to use inputs akin to those needed for making mobile access equipment. *Id.*

The Department found the Turkish companies' statements "detailed" and "comprehensive" and accompanied by explanatory notes. *Id.* But Dimexlift's

---

[9] Tümosan Motor ve Traktör Sanayi A.Ş. and Türk Traktör Ve Ziraat Makineleri A.Ş. Appx1015.

was far less so, "comprised only of an income statement, balance sheet, and a short director's report." Appx1016–1017. The latter also contained a column headed "Annex" with numerical codes referring to explanatory notes, but the notes were not part of the material Dingli submitted. Appx1017. Commerce therefore concluded that the two Turkish statements were the best available information "because the sole financial statements of a Bulgarian producer of comparable merchandise [were] incomplete." *Id.*

Dingli now disputes both the Turkish statements' usability and the Bulgarian ones' deficiencies. As an initial matter, on reply the company asserts that the record in the *second* administrative review of the same antidumping duty order at issue here calls the Department's conclusions into question. Case 24-221, ECF 49, at 12–15. Recall that this case involves the *first* such review.

It is generally improper to raise an argument for the first time in a reply brief. *See, e.g.*, *Stauffer v. Brooks Bros. Grp., Inc.*, 758 F.3d 1314, 1322 (Fed. Cir. 2014). An even bigger problem is that the material Dingli seeks to add is not part of the record here. The company acknowledges that hurdle but shrugs it off by suggesting the court take judicial notice. Case 24-221, ECF 49, at 12–13.[10]

---

[10] Dingli asserts that the court has "take[n] judicial notice of documents in other Commerce [antidumping] proceedings that are publicly available on ACCESS," the agency's

(footnote continues on next page)

That workaround isn't available. The standard of review directs the court to review the matter on the record that existed before the agency at the time of its decision. *See Jiaxing Bro. Fastener Co. v. United States*, 428 F. Supp. 3d 1364, 1379 n.29 (CIT 2020) ("[J]udicial review of [Commerce's] determinations must be limited to the record before the agency that was compiled during that segment of the proceeding.") (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1324–25 (Fed. Cir. 2011)). Not only was the second administrative review's record not before the agency here, it couldn't have been, as it didn't exist yet. And Dingli itself portrays the decision from the second

---

electronic records system. Case 24-221, ECF 49, at 13 (citing *Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327 (CIT 2016)). But *Calgon* says nothing about taking judicial notice. The issue there was the *agency's* use of information from a *prior* review without considering whether more contemporaneous data were more accurate. 145 F. Supp. 3d at 1327.

And Dingli's other cited case, *Catfish Farmers of America v. United States*, 918 F. Supp. 2d 1381 (CIT 2013), likewise did not involve taking judicial notice of extra-record material. It involved the seventh administrative review of an antidumping duty order. The plaintiffs filed a "notice of supplemental authority" citing the results of the eighth review. The court denied the government's motion to strike, reasoning that the plaintiffs did not purport to try to supplement the record. Significantly, however, the court declined to address whether the proffered "supplemental authority" was relevant—all it held was that it was unnecessary to grant the motion to strike to ensure adherence to the proper standard of review. *Id.* at 1383.

review as relying on information apparently generated after the period of review here.[11]

The simple fact is that, on the record that was before the Department in this first administrative review and that is before the court here, the Turkish government had instructed companies not to adjust their financial statements for 2022. Appx1050–1051. "In the absence of *record evidence* to the contrary, Commerce has no reason to question the Turkish accounting and auditing standards authority's finding" that no adjustment was necessary. Appx1051 (emphasis added).

Turning to Dingli's argument about hyperinflation, the Department cited an earlier decision, *Metal Lockers from China*,[12] that stated it is not enough for a party to allege that financial statements "may be distorted by significant inflation." Rather, the party must "provide specific evidence of any such distortion, identify any inflation adjustments that should have [been] made, [and] identify any past instances where Commerce made inflation adjustments in the determination of surrogate financial ratios." Appx1052 (quoting I&D Memo at 14 accompanying 86 Fed. Reg. 35,737). The agency found that Dingli failed to satisfy any of those requirements here.

---

[11] The period of review ran from April 13, 2022, to March 31, 2023. *See* Appx1001. Dingli wants to expand the record to include the Turkish companies' full *2023* financial statements. *See* Case 24-221, ECF 49, at 15.

[12] 86 Fed. Reg. 35,737.

While the company argues that the record shows that the Turkish statements were distorted, it offers no serious response to the Department's observation that *Metal Lockers from China* held "that hyperinflation is not one of the agency's considerations in selecting surrogate financial statements, much less surrogate countries." Appx1052. The company simply says that is not a reason to reject its argument. Case 24-221, ECF 52, at 42. But it cites no authority to overcome the Department's practice.[13]

Dingli alternatively challenges Tümosan's—but not Türk's—financial statements by alleging that they may be distorted by countervailable subsidies from two Turkish government programs. *See* Appx1052 (agency's summary of argument). The Department rejected that theory because the company did not cite "any explicit evidence" in Tümosan's statement or the accompanying explanatory notes. *Id.* The agency said its practice is "to disqualify surrogate financial statements when they indicate evidence of subsidies found by Commerce to be countervailable." Appx1053. It explained that the programs in question are not ones it has found countervailable. *Id.*

---

[13] And while, on reply, Dingli asserts that the government's arguments in support of Commerce's decision are "unsupported by substantial evidence," Case 24-221, ECF 49, at 6, that theory inverts the standard of review. It is not the government's obligation to support its own arguments with substantial evidence, nor must it prove that the Department's decision is so supported. The burden of proving that the agency decision lacks evidentiary support falls on the party challenging it—Dingli. *See* 28 U.S.C. § 2639(a)(1).

The company responds by citing case law, and legislative history,[14] it describes as requiring the Department to reject financial statements when there is "reason to believe or suspect" that receipt of countervailable subsidies distorted the information. It argues, "Commerce was only required to determine if there was a reason to believe or suspect that Tümosan's financial statement was distorted by subsidies." Case 24-221, ECF 52, at 42 (citing *Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333, 1374 (CIT 2014)).

But contrary to Dingli's characterization, *Xinboda* supports the agency's conclusion here. First, that decision observed that "where Commerce has 'reason to believe or suspect' that a potential surrogate may have benefited from subsidies that *the agency has previously found to be countervailable*, it is [its] practice to disregard the financial statements of that company if there is other useable data on the record." 976 F. Supp. 2d at 1368 (emphasis added). As noted above, Dingli cited no evidence that any subsidies Tümosan may have received were ones the agency had previously

[14] Peculiarly, Dingli argues that "Congress expressly instructs Commerce" through the legislative history. Case 24-221, ECF 52, at 43. The court disagrees. The First Branch directs agencies through *statutes*. The company fails to cite any statutory language.

found to be countervailable, and it cites no such evidence before this court, either.[15]

Second, *Xinboda* also stated, as the agency did here, that in considering whether there is "reason to believe or suspect" receipt of countervailable subsidies, "Commerce relies on information in financial statements on an 'as is' basis, and does not look beyond a company's financial statements to consider other information on the administrative record." 976 F. Supp. 3d at 1368 (cleaned up). The Department reasonably invoked that principle to reject an opinion from Dingli's paid expert that Tümosan "likely" received subsidies. Appx1053.[16]

Dingli then argues that Dimexlift's financial statement was superior. *Id.* at 47–48. It contends the statement "breaks out expenses for all 'vital' cost and expense categories." *Id.* at 48 (citing Appx2857). But the only citation it offers in support is to a single page of its agency case brief, which, again, is not evidence. More importantly, Commerce explained that without

---

[15] One of the programs Dingli flags is Turkey's "Exemptions on Banking and Insurance Transaction Tax." Case 24-221, ECF 52, at 44. Commerce found that program is *not* a countervailable subsidy because it is not specific. *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 803 F. Supp. 3d 1276, 1280 (CIT 2025), *appeal pending*, No. 26-1229 (Fed. Cir.).

[16] The company presumably agrees that rejection was appropriate because it admits—elsewhere in its brief—that when Commerce has a routine practice, it must apply it. *See* Case 24-221, ECF 52, at 6 (citing *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004)).

the explanatory notes, it cannot confirm whether the statement's breakout of expenses "is sufficient." Appx1060. The company does not respond to that concern. The Department's issue was not that the statement does not "break[ ] out expenses." Its problem was that it could not *verify* that the statement did so *properly*. That explanation is also reasonable and constitutes substantial evidence.

4

Dingli's remaining challenges to Commerce's selection of Turkey invite the court to re-weigh the evidence. The company gives the game away with its assertion that "Commerce improperly rejected Bulgaria based on deficiencies that are minor relative to the unreliability of Turkey's data." Case 24-221, ECF 52, at 47.

First, Dingli objects to Commerce's finding that the Bulgarian data lacked necessary inflators for adjusting expenses. *Id.* (citing Appx1059). The company contends that "movement expenses are not major" factors of production, such that the inflators' absence "does not support rejection of Bulgaria" as the primary surrogate country. *Id.* It doubles down on reply, insisting that hyperinflation "is the single most important consideration" and that "the alleged 'record-based limitations of Bulgaria's dataset (movement inflators and unusable financial statements)' are significantly less important." Case 24-221, ECF 49, at 5 (citation omitted) (quoting Case 24-221, ECF 55, at 27). But that decision is the agency's—not the court's—to make.

Second, on reply the company asserts that the Bulgarian inflator data were on the record after all. *See id.* at 18 (citing Appx10051–10052, Appx10346–10355). Its explanation appears to be that both it and the Department overlooked the information because the record was "voluminous." *See id.* at 18 n.1. That is effectively an admission that even if the inflators were on the record, Dingli never called them to the Department's attention,[17] which in turn means it failed both to exhaust its administrative remedies and to carry its burden of building an adequate record. "The law does not require Commerce to build the record on the plaintiffs' behalf." *Linyi City Kangfa Foodstuff Drinkable Co. v. United States*, Slip Op. 16-89, at 8–9, 2016 WL 5122648, at *3 (CIT 2016) (citing *QVD Food*, 658 F.3d at 1324).

Third and finally, the company attacks the Department's rejection of a financial statement from Bulgarian firm Balkancar. Recall that Dingli submitted statements from five Bulgarian companies, but Commerce found that only one—Dimexlift—produced relevant merchandise. Appx1015. The company disagrees, asserting that Balkancar makes trucks and other lifting and transport equipment, as well as components

---

[17] Dingli actually says the inflators "were not noticed by [it] or Commerce during" the *second* administrative review "on account of the voluminous [surrogate value] record." *Id.* (emphasis added). Recall that the court has rejected the company's effort to import information from that (later) proceeding.

for them. Case 24-221, ECF 52, at 52 (citing Appx7106, Appx7114, Appx7126).

But the Department rejected Balkancar's data for other reasons as well. It found that the absence of an auditor's opinion rendered the statement unusable. Appx1063. The agency emphasized that without such an opinion, it "cannot ascertain whether the financial statements present financial information fairly in all material respects." *Id.* It said that alone is disqualifying, citing a general practice of not using financial statements that lack an auditor's opinion if the record contains other usable ones. *Id.* (citing I&D Memo, Cmt. 1B, accompanying 85 Fed. Reg. 58,333).

Dingli objects that the Bulgarian government did not require audited financial statements, and it contends that this court has "approved" Commerce's use of such documentation that was suitable aside from the lack of an auditor's opinion. Case 24-221, ECF 52, at 54 (citing *Dingsheng*, 794 F. Supp. 3d at 1343). But *Dingsheng* noted that the Department treated the statement as audited "based on the existence of an auditor's fee." 794 F. Supp. 3d at 1343. The court did not "approve" the use of unaudited statements or otherwise address that issue. For its part, Dingli cites no evidence to establish that Balkancar's information was in fact audited, nor does it dispute that the Turkish statements on the record *were*. Under agency practice as explained by Commerce, that rendered the latter superior.

* * *

The court holds that the Department's selection of Turkey as the primary surrogate country is supported by substantial evidence and therefore sustains it.

B

The next issue in Dingli's case involves how the agency compares normal value with export price. The Department usually compares "the weighted average of the normal values with the weighted average of the export prices," a process known as the "average-to-average method." 19 C.F.R. § 351.414(b)(1), (c)(1). In some cases, however, it instead compares the weighted average of the normal values to the export prices for individual transactions—the "average-to-transaction method." *Id.* § 351.414(b)(3). The former is the default unless the agency finds a different procedure more appropriate in a particular case. *Id.* § 351.414(c)(1).

Here, Commerce used a test known as Cohen's *d* to assess whether the alternative "average-to-transaction" method was more appropriate, but it concluded in the negative. Appx1080. Dingli attacks the agency's use of that test as unlawful. Case 24-221, ECF 52, at 55–56 (citing *Marmen Inc v. United States*, 134 F.4th 1334, 1348 (Fed. Cir. 2025)).

Both the government and the Coalition observe that the Department found the test results did *not* warrant a departure from the default "average-to-average" method that Dingli wanted the agency to use. Case 24-221, ECF 55, at 57 (government); Case 24-221, ECF 51, at 8 (Coalition). They urge the court

to dismiss the company's claim on this issue for lack of standing because the company cannot show either an injury in fact or that the court can provide redress. Case 24-221, ECF 55, at 57–58; Case 24-221, ECF 51, at 9–11.

The court disagrees that the company lacks standing. Dingli has indisputably suffered injury in fact from Commerce's imposition of antidumping duties on its products. In this suit, it seeks to have the agency reconsider its calculation of those duties and thereby reduce them, if not eliminate them altogether.

*If* the court were to remand the selection of a primary surrogate country for purposes of that calculation, the company could conceivably suffer a negative result from the Department's use of Cohen's *d*—after all, the use of Bulgarian data would change the underlying information and thus Dingli's margin. The potential for obtaining relief from that potentially adverse outcome suffices for constitutional standing purposes. "Where Congress has accorded a procedural right to a litigant, such as the right to appeal an administrative decision, certain requirements of standing—namely immediacy and redressability, as well as prudential aspects that are not part of Article III—may be relaxed." *Dalian Meisen Woodworking Co. v. United States*, 571 F. Supp. 3d 1364, 1380 (CIT 2021) (cleaned up) (quoting *Consumer Watchdog v. Wis. Alumni Rsch. Found.*, 753 F.3d 1258, 1261 (Fed. Cir. 2014)).

But the court is not remanding the primary surrogate country issue (nor any other), so even if the agency's use of Cohen's *d* was error, it was harmless in

this context. Thus, there is no need for the court to take up that question, much less remand it to the agency for reconsideration. *See* 5 U.S.C. § 706 (providing that when a court hears a challenge to an agency action, "due account shall be taken of the rule of prejudicial error"); *Suntec Indus. Co. v. United States*, 85 F.3d 1363, 1368 (Fed. Cir. 2017) (holding that § 706 "requires application of a traditional harmless-error analysis and . . . the person seeking relief from the error has the burden of showing prejudice caused by" it).

C

Dingli argues that it was "unlawful" for Commerce to deduct Section 301 duties[18] from its U.S. sales prices. By statute, the Department must adjust the U.S. price (the export price) by deducting

> the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and *United States import duties*, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States.

19 U.S.C. § 1677a(c)(2)(A) (emphasis added).

[18] Section 301 duties are meant to combat certain trade practices in foreign countries. *See* 19 U.S.C. § 2411 (authorizing such duties); Appx1081–1083 (agency explanation).

Dingli acknowledges four cases[19] in which this court has held that Section 301 levies are deductible as "import duties," but says that it "respectfully disagrees with [all of them] and requests that this Court find that Section 301 duties are special duties and therefore are not deductible." Case 24-221, ECF 52, at 57. It argues that they are "special duties" because their purpose is to convince the Chinese government to eliminate unfair trade practices. *Id.* at 61.

The company's opening brief conspicuously ignores the Federal Circuit's decision in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023), which affirmed a CIT ruling sustaining the Department's deduction of Section 232 duties[20] from U.S. prices. The court of appeals defined the question as "whether a duty is to be imposed on top of the amount of antidumping duties that would be due without the [Section 232] duty or, instead, is to partly or wholly substitute for such duties." *Id.* at 34.

To answer that question, the court held it is necessary to examine the document imposing the levy. If it is in addition to any other duties, it is a "United States

---

[19] *Shanghai Tainai Bearing Co. v. United States*, Slip Op. 24-143, 2024 WL 5154030 (CIT 2024); *Shanghai Tainai Bearing Co. v. United States*, Slip Op. 24-142, 2024 WL 5154032 (CIT 2024), *appeal pending*, No. 25-1405 (Fed. Cir.); *Jinko Solar Imp. & Exp. Co. v. United States*, 701 F. Supp. 3d 1367 (CIT 2024); and *Neimenggu Fufeng Biotechs. Co. v. United States*, 741 F. Supp. 3d 1354 (CIT 2024).

[20] The term "Section 232 duties" refers to levies imposed under Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862. *See* 63 F.4th at 27.

import duty." *Id.* "[I]n addition to any other duties" means "that, when applied to an article covered by antidumping duties, the [additional] and antidumping duties must together result in a full imposition of both duties." *Id.* at 35. "Producing that result requires the antidumping duty to be calculated as if the [Section 232] duty did not exist"—that is, by subtracting the latter from the U.S. price. *Id.* Otherwise, the antidumping duty would decrease "(through an increase in the U.S. price and therefore a decrease in the dumping margin), defeating the evident 'in addition to' prescription." *Id.*

The U.S. Trade Representative's notice imposing the Section 301 duties states that relevant Chinese products "will be subject to an additional *ad valorem* duty of 25 percent. The rates of duty . . . *apply in addition to all other applicable duties, fees, exactions, and charges*." 83 Fed. Reg. 40,823, 40,824 (emphasis added). Under *Borusan*, that language resolves the issue. The Section 301 duties must be deducted from the U.S. price.

On reply, Dingli responds that *Borusan* does not apply because Section 232 duties address national security, whereas the Section 301 levies "serve a trade-related, remedial purpose." Case 24-221, ECF 49, at 26. That argument is frivolous.

The company ignores *Borusan*'s *ratio decidendi*—its reasoning "that allows it to have life and effect in the disposition of future cases." *AM/NS Calvert LLC v. United States*, 654 F. Supp. 3d 1324, 1345 (CIT 2023) (quoting *Ramos v. Louisiana*, 590 U.S. 83, 104

(2020)). The Federal Circuit did not rely on what subject the duties addressed. Instead, it emphasized that the words of the proclamation or other notice imposing the duty control. *Borusan*, 63 F.4th at 34. The court also emphasized that it was not grounding its decision in *Chevron* deference because its analysis reflected "[t]he best interpretation of the statute." *Id.* at 36.

*This* court, in turn, is bound by the Federal Circuit's construction of 19 U.S.C. § 1677a(c)(2)(A). For that reason, Dingli's assertion that the court should "decline Defendants' invitations to extend *Borusan* and endorse *Shanghai Tainai* . . . and the other rulings of this Court," Case 24-221, ECF 49, at 25–26, completely misses the point.

None of the CIT opinions Dingli criticizes "extended" *Borusan*. They faithfully applied its *ratio decidendi* and rejected the same arguments the company makes here. *See Jinko*, 701 F. Supp. 3d at 1392 ("Although Jinko contends that *Borusan* . . . involved Section 232 duties concerning national security, [that case] rejects such statute-wide distinctions. *Rather, it is the text of the order imposing the duty that controls.*") (emphasis added); *Fufeng*, 741 F. Supp. 3d at 1381 (rejecting argument that *Borusan*'s rationale is limited to Section 232 duties and finding it "suggests a much wider sweep" because of its "implementing instrument–specific approach"); *Shanghai Tainai*, 658 F. Supp. 3d at 1294 (stating that the principle of examining the implementing instrument to ascertain whether duties are in addition to other levies, "as elucidated in *Borusan*, extends

beyond Section 232 duties and applies to other statutory duties").

The court therefore sustains Commerce's deduction of Section 301 duties from Dingli's U.S. sales price.

* * *

Dingli's numerous attacks on Commerce's determination fail across the board. In Case 24-221, the court therefore denies the company's motion for judgment on the agency record (ECF 52) and sustains the agency's decision. A separate judgment will enter. *See* USCIT R. 58(a).

III

Turning to the Coalition's case, it attacks two aspects of Commerce's final decision. The court considers these points in turn.

A

The Department used Bulgarian Harmonized Tariff Schedule (HTS) codes to value three inputs. Appx1083–1084. It explained that only those codes provided appropriate values. Appx1083.

The Coalition disputes that characterization, arguing that for every input, it identified a Turkish 12-digit HTS code that was specific, while Dingli "identified more general, 6- or 8-digit Bulgarian HTS codes." Case 24-219, ECF 52, at 14–15 (citing Appx2641). The group contends that the agency's use of Bulgarian data is unsupported by substantial evidence and unlawful.

The Coalition's argument is essentially the same for all three inputs. Dingli proposed a six- or eight-digit Bulgarian code and the group responded by proposing a 12-digit Turkish code that ended in "0000." *See id.* at 15–16 (citing Appx12912–12913, the Coalition's agency submission). The Coalition explains that Turkey and Bulgaria both use the European Union's Integrated Tariff system, which it says means their subheadings are identical down to the eight-digit level. *Id.* at 16. It also argues that "a code ending in '00.00' represents a subheading that does not get any more specific." *Id.* As a result, the group contends, the subheadings were the same, so Commerce erred by not using data from the primary surrogate country—Turkey. *Id.*

Dingli argued that the record was unclear about whether the Turkish codes ending in -.0000 were in fact the only 12-digit codes corresponding to their shorter parents. *Id.* (citing Appx1085–1086). Commerce agreed and found no record evidence proving that the Coalition had provided every 12-digit Turkish code for the relevant six- or eight-digit subheadings. Appx1086.

The group now contends that finding was wrong because it "expressly represented to Commerce" that it had provided data for "*every* HS subheading at the 12-digit level comprising" the Turkish equivalents to Dingli's six-digit Bulgarian headings. Case 24-219, ECF 52, at 17 (emphasis in original) (citing Appx12655–12695). "Pursuant to 18 U.S.C. § 1001, which subjects parties to criminal penalties for knowingly making material false statements to the U.S.

Government, that representation was presumptively true." *Id.*

The court disagrees. Section 1001 does not obligate the agency to accept on faith an interested party's representations concerning factual matters.

The Department's (reasonable) point was that the Coalition offered no evidence supporting its claim. The group submitted an Excel spreadsheet it claimed was exhaustive. As the government notes, however, "the Coalition could have provided relevant excerpts from the Turkish tariff schedule containing the entire 12-digit HS breakouts under the six-digit HS but failed to do so." Case 24-219, ECF 56, at 38–39 (citing Appx1084). And Dingli asserts that "instead of self-created Excel sheets, the Coalition should have submitted 'relevant excerpts [in PDF] . . . .'"[21] Case 24-219, ECF 51, at 5 (brackets in original) (quoting Case 24-219, ECF 56, at 39).

Finally, the Coalition also argues that the Department had to give preference to Turkish data because that country was the primary surrogate. Case 24-219, ECF 52, at 15, 28–29 (opening brief); Case 24-219, ECF 53, at 3, 10–11, 19–20 (reply). But the statute allows for the use of multiple surrogate countries when the agency finds it necessary. *See* 19 U.S.C. § 1677b(c)(1) (allowing use of data from "a market

[21] Dingli also contends that, in the *agency proceedings*, the Coalition was untimely in asserting that its Excel submissions were comprehensive. It calls that claim "new factual information" and says it "should be rejected." Case 24-219, ECF 51, at 5. That is an issue for Commerce, not this court.

economy country *or countries*" Commerce considers appropriate) (emphasis added). That's what happened here. Contrary to the Coalition's argument, it was not unlawful for the agency to use Bulgaria as a secondary source.

B

The Coalition's other data-quality argument involves the Turkish HTS codes the Department used to value brakes, steel forearm articles, and circuit breakers. It again complains that it identified 12-digit Turkish subheadings specific to the inputs, but the agency instead selected Dingli's "more general" six-digit Turkish codes. The group calls that finding unsupported by substantial evidence and not in accordance with law. Case 24-219, ECF 52, at 29.

As it did with the "Bulgarian versus Turkish headings" issue, the agency rejected the Coalition's offerings because there was no record evidence that the subheadings the group listed represented the entire universe of potential codes. *See, e.g.*, Appx1093 (brakes) ("There is no record evidence that five Turkish 12-digit breakouts comprise parent HS 8708.30."). While the group argues that "Commerce's factual premise was incorrect because all Turkish 12-digit subheadings were on the record," Case 24-219, ECF 52, at 32, it again fails to cite actual evidence substantiating its claim.

In urging the court to reject the Coalition's arguments, Dingli cites a decision memorandum in which the Department explained that an HTS category with

more digits might be *too specific*, "overly-narrow relative to the input used by the respondent." Case 24-219, ECF 51, at 22 (quoting I&D Memo, Cmt. I.C., accompanying 78 Fed. Reg. 28,803).

That point is valid. Commerce's role in an antidumping duty case is not to "engage in a classification analysis to determine which HTS subheading contained the relevant input." *Mobile Access I*, Slip Op. 24-66, at 21, 2024 WL 2796654, at *7 (cleaned up) (citing *Downhole Pipe*, 776 F.3d at 1379). Its task instead is "to determine which of the competing sub-headings constituted the best available information for valuing [the] input." *Id.* (quoting 776 F.3d at 1379). That is what the Department did here for brakes and steel forearm articles. It explained that, absent actual record evidence proving that the Coalition's 12-digit proposals were in fact specific, the six-digit categories Dingli offered were "sufficiently specific to the inputs in question." Appx1093 (brakes); Appx1094 (forearm articles).

Finally, Commerce rejected the Coalition's proposed circuit-breaker code for a different reason. The group argued that the 12-digit subcategories' application depended on whether the breaker is a "household miniature" unit and that the amperage of Dingli's input meant only one subheading could apply. Appx1104. The Department responded that it was unclear whether the devices' *functionality* differed in any substantial way from the "household miniature" type, even recognizing the different settings for their use, and it found no record evidence showing the amperage rating for Dingli's breakers. Appx1105.

The Coalition responds by asking the court to weigh the evidence. It contends the agency credited Dingli's "unsupported assertion that its circuit breakers *could be* similar to household circuit breakers (with no evidence to that effect) over Petitioner's facially reasonable deduction that they are not." Case 24-219, ECF 52, at 40 (emphasis in original). It is not this court's role, however, to decide whether a "deduction" is "reasonable," much less whose claim deserves credit.

The group also attacks the finding that Dingli's reporting of its input as "circuit breaker—20 A, 125/220 V," was insufficient, by itself, to establish that it could not fall within HTS subcategories covering higher-rated breakers because nothing in the record showed they were definitively excluded from such broader headings. *Id.* at 37–38. Commerce found that the stated amperage related only to one part, not necessarily to the entire circuit breaker, Appx1104–1105, such that there was "no record evidence to determine whether Dingli's circuit breaker should be rated above or below 63 amps." Appx1105. Again, for the court to disagree, it would have to weigh the evidence.

* * *

The Coalition's limited challenge to Commerce's determination fails. In Case 24-219, the court therefore denies the group's motion for judgment on the agency record (ECF 52) and sustains the agency's decision. A separate judgment will enter. *See* USCIT R. 58(a).

Dated: September 23, 2026 /s/ *M. Miller Baker*
New York, NY Judge