**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| ZHEJIANG DINGLI MACHINERY CO., LTD.,<br>*Plaintiff*,<br>v.<br>UNITED STATES,<br>*Defendant*,<br>and<br>COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br>*Defendant-Intervenor*. | Court No. 24-221 |

**RESPONSE TO ORDER TO SHOW CAUSE**

Counsel for Plaintiff Zhejiang Dingli Machinery Co., Ltd. ("Dingli") respectfully submits this response to the Court's September 22, 2026 Order to Show Cause, ECF 58 ("Show Cause Order"). The Court directed Plaintiff to substantiate two statements in Plaintiff's Opening Brief concerning the role of the U.S. Department of Commerce ("Commerce") in a Canadian antidumping duty ("ADD") investigation, or, if those

statements could not be substantiated, to show cause why Plaintiff or its counsel should not be sanctioned under USCIT Rule 11(b)(3). The Court also directed Plaintiff to submit declarations identifying who participated in drafting and editing the Opening Brief, including the specific authorship of the statements on pages 25-26.

## PRELIMINARY STATEMENT

Plaintiff and its counsel, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP ("GDLSK"), acknowledge that the statements on pages 25-26 are incorrect. Commerce did not participate in the Canadian ADD investigation and did not make factual findings in that proceeding. The statements on pages 25-26 of the Opening Brief stating otherwise were the result of inadvertent drafting and editing errors by GDLSK attorneys, not the use of artificial intelligence. The GDLSK attorneys accept responsibility for the errors and apologize to the Court.

The declarations submitted with this Response establish unequivocally that the Opening Brief was drafted by three GDLSK partners—Ned Marshak, Dharmendra Choudhary, and Jordan Kahn—and that no Dingli employee or representative participated in preparing or editing the brief. They also establish that no artificial intelligence or

other software program was used to write or edit the Opening Brief (including the statements on pages 25-26).

The drafting history set forth in the declarations and below confirms that the erroneous statements were inadvertently introduced during the collaborative briefing process. The paragraph at issue, as it appeared in the initial draft, was consistent with the argument counsel made in the underlying administrative proceeding and elsewhere in the Opening Brief: namely, that Commerce should have taken into account the findings of the Canadian government in its independent investigation. A subsequent draft introduced a typographical error, and further editing inadvertently inserted "Commerce" into the first sentence and "Commerce's" into the final sentence, transforming an accurate description of the Canadian government's findings into the two erroneous statements identified in the Show Cause Order. Nothing in the drafting history suggests any purposeful attempt to mislead the Court or Defendant. These were innocent mistakes.

For the reasons set forth more fully below and in the accompanying declarations, counsel for Plaintiff respectfully submits that there is no basis to impose sanctions on Dingli or the three GDLSK partners under

USCIT Rule 11. Dingli, for its part, had no involvement whatsoever in drafting or editing the Opening Brief. And, with respect to the GDLSK attorneys, this Circuit has consistently declined to impose sanctions *sua sponte* in cases like this, where: (1) the factual errors—here, two words in a single paragraph of a 69-page brief—were inadvertent; (2) the drafting attorneys admitted their errors at the first opportunity after being advised of them; and (3) neither the Defendant nor the Court was, in fact, misled. *See In re Violation of Rule 28(c)*, 388 F.3d 1383, 1385 (Fed. Cir. 2004) ("So far as we have been able to determine, this court has not in the past exercised its authority to impose sanctions for 'inadvertent' violations of applicable court rules.")

In the end, counsel does not attempt to excuse their mistakes. The statements on pages 25-26 are wrong. Counsel acknowledges its mistakes, explains how they occurred, identifies who wrote and edited the language, confirms that no artificial intelligence or other software was involved, and respectfully asks the Court to consider the complete record in determining whether sanctions are warranted.

# FACTUAL BACKGROUND

## I. THE ATTORNEYS WHO PREPARED THE OPENING BRIEF

Plaintiff challenged Commerce's final results of the first administrative review ("AR1") of the ADD order on certain mobile access equipment and subassemblies from the People's Republic of China by initiating an appeal by Summons (ECF 1) and Complaint (ECF 10). As part of that challenge, Plaintiff submitted, among other documents: its proof Opening Brief filed on August 4, 2025 (ECF 32); its corrected proof Opening Brief on August 12, 2025 (ECF 34); and its final Opening Brief on July 16, 2026 (ECF 52).

The final Opening Brief, which is the subject of the Court's Show Cause Order, was prepared and reviewed collaboratively by three GDLSK partners: Ned Marshak, Dharmendra Choudhary, and Jordan Kahn. These partners made and were responsible for all substantive statements in the Opening Brief.[1] They have worked together on ADD cases for many years, and they have decades of experience litigating

[1] At various times, the three partners were assisted in the Opening Brief by GDLSK Associate Mia Howard, GDLSK Associate Max Park, GDLSK Senior Paralegal Amy Harris, and GDLSK Paralegal Christopher Lee. These individuals did not participate in the drafting or review process that led to the erroneous statements.

before this Court, appearing in hundreds of cases and authoring or co-authoring numerous briefs over that time. *See* Marshak Dec. ¶¶ 2, 7; Kahn Dec. ¶¶ 2, 4-5; Choudhary Dec. ¶¶ 2, 8, 12.

The final Opening Brief was drafted entirely by counsel. It was not prepared with the assistance of artificial intelligence, or with any involvement from Dingli personnel.[2] *See* Marshak Dec. ¶¶ 4-5; Choudhary Dec. ¶¶ 4-5; Kahn Dec. ¶¶ 6-7. The unfortunate reference to "Commerce" and "Commerce's" on pages 25-26 in the Opening Brief were the GDLSK partners' mistake, and no one else's.

## II. COUNSEL'S CANADIAN ADD INVESTIGATION ARGUMENT WAS INADVERTENTLY MUDDLED ON PAGES 25-26 DURING THE EDITING PROCESS

Counsel has consistently argued in its submissions to Commerce and this Court that Commerce is required to consider a decision by the Canadian government in a Canadian ADD investigation that Turkish data was distorted by hyperinflation and therefore was unreliable. Counsel believed that the Canadian government decision offered guidance to Commerce in AR1 to determine the appropriate surrogate

---

[2] The Opening Brief was not accompanied by a certification to this effect, as it was filed before the effective date of that requirement. Plaintiff's subsequent briefs did contain such certifications.

country in the review being challenged in this action. At no point during AR1 did counsel suggest that Commerce itself participated in, or made findings in, the Canadian ADD investigation.

It was Marshak, Choudhary, and Kahn's intention to reprise that same argument on appeal. Indeed, GDLSK did so accurately on pages 31-32 of the Opening Brief, arguing that "Commerce cannot summarily reject" the relevance of "the Canadian PMS findings regarding distorted prices of primary steel inputs" to its decision. Opening Brief at 31. Counsel cited directly to Canada's findings in its Opening Brief. *Id.* (citing Appx 10825-10868).

Unfortunately, during the editing process of the Opening Brief, which is described more fully below, another reference to that argument was distorted by counsel's inadvertent addition of the words "Commerce" and "Commerce's" in a paragraph that starts on page 25 and ends on page 26. The inclusion of those words, in that paragraph, was the product of human drafting error, not of an artificial intelligence hallucination. The paragraph provides that:

> Fourth, Commerce disregards the de-dollarization of the Turkish economy during July 2021 – August 2022, which was recognized *by Commerce* in the Canadian AD investigation on Turkish rebar. . . .

> Yet Commerce claims that "the Canadian government's determination is based on its own distinctive record information . . . {and} does not serve as a binding precedent" IDM at 10, Appx1047. This alibi is unavailing because the record in this proceeding does not contain any information contradicting *Commerce's* factual findings in the Canadian investigation.

Opening Brief at 25-26 (emphases added) (ECF 52).

Counsel acknowledges that its characterization of the Canadian ADD investigation in that paragraph is not accurate. In fact, Commerce did not participate in that investigation, and it did not make any factual findings in that proceeding.

Counsel did not intend to misstate that Commerce participated in the Canadian government investigation in its Opening Brief, and regrets having done so. This was an honest mistake of counsel, as shown by an examination of the chronology of drafting Plaintiff's Opening Brief and other documents in the administrative and judicial record.

## III. THE EDITING PROCESS LED TO THE UNINTENDED MISSTATEMENTS

The initial draft of the Opening Brief prepared by GDLSK Partner Choudhary did not contain either of the inaccurate statements. That draft, dated July 29, 2025, conveyed that Commerce did not have any

evidence to contradict the fact that there was a de-dollarization of the Turkish economy, a fact that had been recognized in the Canadian ADD investigation. Specifically, the initial draft stated:

> Fourth, the de-dollarization of Turkish economy during July 2021 – August 2022, affirmed in the Canadian AD investigation on Turkish rebar, Dingli's Revised Case Brief at 13, supports that during the overlapping POR, TLR was the primary currency in the Turkish financial system including notably for trading. This fact, in turn, strongly suggests that a preponderant proportion of Turkish POR imports were likely denominated in hyperinflation-distorted TLR instead of Euro. *Id.* at 15. Commerce's alibi that "the Canadian government's determination is based on its own distinctive record information . . . {and} does not serve as a binding precedent" IDM at 10, is unavailing as the record lacks information contradicting the factual findings of the Canadian investigation.

Choudhary Dec. ¶ 7, Exhibit 1. There was no statement in this draft that Commerce itself was involved in or made factual findings in the Canadian ADD investigation.

Through counsel's normal, collaborative brief-writing process, Choudhary's initial draft was shared with other partners, here Marshak and Kahn, to review and edit. Over the course of several days, a series of revisions were made to that draft by Marshak, Kahn, and Choudhary,

and revised drafts were shared between them. For instance, the initial draft of that paragraph was edited on July 30, 2025, as follows:

> Fourth, Commerce disregards the de-dollarization of Turkish economy during July 2021 – August 2022, recognized *by in* [sic] the Canadian AD investigation on Turkish rebar. Dingli Brief at 13. This occurrence establishes that during the overlapping POR, TLR was the primary currency in the Turkish financial system including notably for trading. This fact, in turn, strongly suggests that a preponderant proportion of Turkish POR imports were likely denominated in hyperinflation-distorted TLR instead of Euro. *Id.* at 15. Yet Commerce claims that "the Canadian government's determination is based on its own distinctive record information . . . {and} does not serve as a binding precedent" IDM at 10. This alibi is unavailing because the record lacks information contradicting the factual findings of the Canadian investigation.

Choudhary Dec. ¶ 9, Exhibit 2 (emphasis added).

Like the first draft, this revision contained no statements that Commerce itself was involved, or made any findings, in the Canadian ADD investigation. However, in the revised first sentence, a typographical error was introduced stating "the de-dollarization . . . recognized *by in* the Canadian AD investigation." *Id.* (emphasis added); Kahn Dec. ¶ 8. This simple error may have been the cause of the

misstatements that later appeared in the final version of the Opening Brief.

That draft was shared between the three partners, Choudhary, Marshak, and Kahn, and then further revised into the final proof brief as follows:

> Fourth, Commerce disregards the de-dollarization of the Turkish economy during July 2021 – August 2022, which was recognized by Commerce in the Canadian AD investigation on Turkish rebar. Dingli Brief at 13. This de-dollarization establishes that during the overlapping POR (April 13, 2022 – March 31, 2023), TLR was the primary currency in the Turkish financial system, including for trading. This fact, in turn, strongly suggests that the majority of Turkish POR imports were denominated in hyperinflation-distorted TLR, rather than Euro. *Id.* at 15, Appx____. Yet Commerce claims that "the Canadian government's determination is based on its own distinctive record information . . . {and} does not serve as a binding precedent" IDM at 10, Appx____. This alibi is unavailing because the record in this proceeding does not contain any information contradicting Commerce's factual findings in the Canadian investigation.

Choudhary Dec. ¶ 10; ECF 32 (final proof brief); ECF 34 (corrected proof brief); ECF 52 (final brief containing Appx numbers).

In this above final version that was filed, the word "Commerce" was mistakenly inserted between "by" and "in" in the first sentence. Marshak

Dec. ¶ 6. This may have been an unsuccessful attempt to remedy the typographical error. Compounding the issue, the word "Commerce's" was correspondingly inserted between "contradicting" and "factual" in the last sentence of the same paragraph. Marshak Dec. ¶ 6. The addition of those two words transformed an originally clear and accurate paragraph regarding a decision by the Canadian government into one with unintended misstatements.

Counsel's word choice errors occurred during the back-and-forth editing process, and they were unfortunately not identified by the three GDLSK partners responsible for preparing the Opening Brief, Choudhary, Marshak, and Kahn. *See* Choudhary Dec. ¶¶ 11-14; Marshak Dec. ¶¶ 6-9; Kahn Dec. ¶¶ 8-11. They regret their oversight – if any of them had realized the mistake when they reviewed the Opening Brief before submission, they would have immediately moved to correct the record.

Counsel asks the Court to consider the following additional factors in deciding whether sanctions are appropriate. When multiple attorneys review clean and red-lined drafts, words are often eliminated or modified in an effort to improve the style or to make a sentence more concise. The

three GDLSK partners responsible for the Opening Brief have worked together for the past nine years, and have co-authored dozens of briefs, by exchanging clean and red-lined drafts in the same manner as drafts were exchanged in this case. Counsel believe that this system works: Briefs are carefully reviewed for accuracy, extraneous words are cut, and the writing style is improved. This careful editing process broke down with respect to one paragraph in drafting this particular 69-page Opening Brief. This discussion is not meant to excuse the errors; counsel merely wishes to advise the Court that a brief-writing system that has proven reliable in the past did not catch a mistake in this Opening Brief. For that, GDLSK is sorry.

## IV. THE RECORD CONFIRMS THAT THE INACCURATE STATEMENTS WERE INADVERTENT AND ISOLATED

Counsel did not intend to argue that Commerce itself participated in the Canadian ADD proceedings. The record before Commerce and this Court confirms that counsel at all times intended to argue that the Canadian government had found that the Turkish economy had been de-dollarized and that Commerce's factual findings in AR1 should conform to the findings of the Canadian government. As set forth below, this understanding is clear from: (1) the remainder of the briefing in this

appeal, including counsel's statement elsewhere in the Opening Brief and Defendant's Response Brief that shared the understanding that counsel intended to convey; and (2) all submissions on the AR1 record.

## A. The Briefing Before This Court

The record on appeal demonstrates that counsel's mischaracterizations of Commerce's involvement in a foreign ADD investigation on page 25-26 of the Opening Brief was an isolated mistake. It did not appear anywhere else in the briefing. Indeed, several pages after those mischaracterizations, counsel accurately described Commerce's lack of involvement in the Canadian government proceeding. Specifically, on pages 31-32 of the Opening Brief, counsel argued that:

> Commerce improperly rejected Dingli's argument which relied on *the Canadian government's particular market situation ("PMS") findings*. . . . Since *the Canadian PMS findings* regarding distorted prices of primary steel inputs . . . are unrebutted relevant evidence on this record, Commerce cannot summarily reject their relevance to its decision to this case. Contrary to Commerce's claim, *these PMS findings* do "provide a guidance in the conduct of this administrative review."

Opening Brief at 31-32 (emphasis added). To support that argument, counsel cited to the Canadian ADD determination on page 31, which it

included as an exhibit in the AR1 administrative record and, accordingly, was included in the Appendix on appeal.

On these pages of the Opening Brief, Plaintiff was challenging Commerce's position that it need not consider *another government's findings* that Turkey's import pricing data was unreliable when making its determination in AR1. That was the argument counsel intended to make on pages 25-26 of the Opening Brief (and did make in its first draft of that brief).

Defendant understood counsel's argument, even though it was misdescribed in one paragraph in the Opening Brief. Defendant's Response Brief addressed what counsel intended to argue (and believed it had consistently argued) about Commerce's failure to accept the findings of the Canadian government:

> Finally, Commerce reasonably rejected Dingli's reliance on the Canadian government's particular market situation findings concerning Turkish rebar. Commerce explained that it has no practice of importing particular market situation determinations from foreign authorities into surrogate country selection in nonmarket economy proceedings, particularly where those findings concern a different product, record, and legal framework. IDM at 10–11, Appx1047-1048.

Defendant's Corrected Response to Consolidated Plaintiffs' Rule 56.2 Motions for Judgment on the Agency Record (July 30, 2026), ECF 55, at 30.

Neither Defendant nor Defendant-Intervenor addressed the erroneous Opening Brief statements in their Response Briefs. That is not an excuse for GDLSK's error, and we understand that Defendant and Defendant-Intervenor were not obligated to discuss this issue. If they had, however, counsel would have been alerted to the error before the Show Cause Order, and would have immediately provided clarification and corrected the record in its Reply Brief.

The briefing before this Court shows that the mischaracterizations on pages 25-26 were unintentional clerical errors made during the editing process. Counsel's statements about the Canadian ADD investigation elsewhere in the Opening Brief and in response to Defendant's Response Brief (and throughout the AR1 proceeding), reflect Plaintiff's position: the Canadian investigation findings on Turkey should have been considered by Commerce during the administrative review process, not summarily rejected. Counsel wishes it had presented that position consistently throughout its entire Opening Brief.

## B. The Administrative Record

The record in the underlying administrative proceeding also reveals that counsel's description of the Canadian ADD investigation on page 25-26 of the Opening Brief was an isolated mistake. During AR1, counsel was at all times challenging Commerce's refusal to consider the Canadian investigation's findings that Turkey's import prices were distorted and unreliable. First, in its Final Surrogate Value Submission, filed on March 27, 2024, counsel placed on the record multiple documents supporting its position that the Turkish economy was subject to hyperinflation in the AR1 period of review ("POR"), and that these hyperinflationary conditions precluded Commerce from selecting Turkey as the primary surrogate country. Appx10051-10053 (Exhibit List for Exhibit TR-9: Information Demonstrating Turkish Hyperinflation During POR).

Second, in those Final Surrogate Value Comments, counsel specifically submitted the Canadian government's decision at issue in this Show Cause Order. Appx10825-10868. In that decision, issued on May 10, 2023, the Canada Border Services Agency concluded that "a particular market situation exists with respect to the rebar market in

Türkiye, which does not permit a proper comparison with the sales of the goods to the importer in Canada." Appx10826. This was the precise finding that counsel was asking that Commerce make in AR1.

Third, in its "pre-preliminary" comments filed on April 1, 2024, counsel's argument focused on the Canadian proceeding itself, and did not suggest that Commerce was involved therein:

> In a recent antidumping proceeding on Turkish concrete reinforcing bar for July 1, 2021 through August 31, 2022 (overlapping with POR 1), the Canada Border Services Agency ("CBSA") affirmed a particular market situation ("PMS") in Turkey, thereby confirming that the prices of steel inputs reported in the domestic Turkish market were distorted.

Appx12125.

Fourth, Defendant-Intervenor in its rebuttal comments filed on April 11, 2024, understood counsel's argument about the relevance of the Canadian proceeding to Commerce's decision: "Dingli cites certain Canadian particular market situation findings as evidence that the Turkish market is too distorted to serve as a surrogate country." Appx12669.

Fifth, in the Preliminary Results, published on May 1, 2024, Commerce rejected counsel's position and agreed with Defendant-

Intervenor that Turkey was an appropriate choice as the primary surrogate country. Appx1017.

Sixth, counsel's administrative case brief filed on June 20, 2024, confirmed that counsel was not arguing that Commerce was involved with the Canadian investigation:

> The Government of Canada's affirmative PMS findings against Turkish steel products supports rejecting Turkey as the primary surrogate country. The Canadian government determined that the volatile economic conditions in Türkiye, in particular, hyperinflation and severe currency depreciation, combined with the effect of Turkish policies in response to hyperinflation, resulted in distorted costing and pricing for rebar, and, by extension, to other steel products.

Appx2828.

Seventh, Defendant-Intervenor in its rebuttal brief filed on June 17, 2024, expressed the correct understanding: "Dingli cites certain Canadian particular market situation ('PMS') findings as evidence that the Turkish market is too distorted to serve as a surrogate country." Appx2762.

Finally, Commerce's Issues and Decision Memorandum dated November 4, 2024, reflected its accurate understanding: "Dingli's reliance on the Canadian government's finding is misplaced." Appx1047.

Counsel's misstatements in the Opening Brief were unintentional errors that arose during the editing process, and unfortunately were not corrected before it was filed. Counsel did not mean to say, as they did on pages 25-26 of the Opening Brief, that Commerce had been involved in the Canadian proceeding. Their intended meaning was correctly described six pages later, on pages 31-32, and they apologize for the errors.

## ARGUMENT

### I. GDLSK'S INADVERTENT ERRORS SHOULD NOT BE SANCTIONED UNDER CIT RULE 11

Under Rule 11 of the Rules of the United States Court of International Trade ("CIT Rules"), a court may, on its own initiative, order an attorney, law firm, or party to show cause why its conduct has not violated CIT Rule 11(b) and to impose sanctions if it cannot. CIT Rule 11(c)(3). In relevant part, CIT Rule 11(b)(3) requires a party presenting a paper to the court to "certif[y] that to the best of the person's knowledge, information, and belief, formed after any inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." CIT Rule

11(b)(3). CIT Rule 11 is "identical to Federal Rule of Civil Procedure Rule 11 . . . and it therefore is appropriate to look to decisions under the latter in interpreting and applying the identical rule of the Court of International Trade." *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1353 (Fed. Cir. 2003).

Courts apply an objective unreasonableness standard to determine the applicability of Rule 11 sanctions. *1-10 Indus. Assocs., LLC v. United States*, 528 F.3d 859, 869 (Fed. Cir. 2008). "[T]he test is one of reasonableness under the circumstances"; accordingly, "[c]ontext thus matters." *Id.* (quotations omitted).

Critically, the Federal Circuit has drawn a line between inadvertent error and sanctionable conduct. *See, e.g., Precision Specialty Metals*, 315 F.3d at 1357 ("courts have been reluctant to punish a lawyer for inadequate or unsound research" which "may constitute negligence, but not conduct sanctionable under Rule 11"); *In re Violation of Rule 28(c)*, 388 F.3d 1383, 1385 (Fed. Cir. 2004) (declining to impose sanctions under appellate rules for "inadvertent" rule violation); *Retamal v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 439 F.3d 1372, 1378 (Fed. Cir. 2006) (reversing Rule 11 sanctions imposed *sua sponte* by

USCIT because attorney's assertion, while incorrect, was "neither frivolous nor inappropriate").

Moreover, several of the Federal Circuit's sister circuits caution courts to employ "extra care in imposing sanctions" pursuant to a show-cause proceeding initiated by the trial judge, as opposed to by motion. *E.g., Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 148 (3d Cir. 2024) ("*sua sponte* sanctions call for more caution"). That is because *sua sponte* sanctions deny a lawyer the opportunity to withdraw the challenged document pursuant to the "safe harbor" provision applicable to motion-based sanction requests. *Id.*; *see also In re Pennie & Edmonds LLP*, 323 F.3d 86, 87 (2d Cir. 2003) (adopting heightened bad faith standard for *sua sponte* sanctions); *Hunter v. Earthgrains Co. Bakery,* 281 F.3d 144, 151 (4th Cir. 2002) ("a court is obliged to use extra care in imposing sanctions" pursuant to a *sua sponte* show cause order); *United National Insurance Co. v. R & D Latex Corp.,* 242 F.3d 1102, 1115 (9th Cir. 2001) ("*sua sponte* sanctions will ordinarily be imposed only in situations that are *akin to a contempt of court*") (quotations omitted; emphasis in original). The Federal Circuit has apparently not weighed in on this issue.

Finally, under CIT Rule 11, sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and because this proceeding is court-initiated, sanctions may not include an award of attorneys' fees. CIT Rule 11(c)(4), (c)(5)(B).

## II. THERE IS NO BASIS TO SANCTION DINGLI

As a threshold matter, there is no basis to sanction Dingli itself. As discussed above, and in the attached declarations, Dingli personnel were not involved in the preparation of the Opening Brief in any capacity. *See* Marshak Dec. ¶ 5; Kahn Dec. ¶ 7; Choudhary Dec. ¶ 5. *See Collier v. Marshall, Dennehey, Warner, Coleman & Goggin*, 977 F.2d 93, 94 (3d Cir. 1992) (unless party represented by counsel "knowingly commits an act that violates Rule 11, sanctions against her would not be appropriate").

## III. GDLSK SHOULD NOT BE SANCTIONED

The attorneys who drafted the Opening Brief—Marshak, Kahn, and Choudhary—do not dispute their errors. They acknowledge that Commerce did not participate in the Canadian investigation and, accordingly, did not make any factual findings in that proceeding. They therefore admit the inaccuracy of: (1) the statement in its Opening Brief at pages 25-26 that the de-dollarization of the Turkish economy "was

recognized by Commerce in the Canadian AD investigation"; and (2) the statement in the Opening Brief concerning "Commerce's factual findings in the Canadian investigation."

However, since the errors were inadvertent and did not mislead Defendant or the Court, and because the GDLSK attorneys acknowledged their errors the first time they realized they had made a mistake, GDLSK respectfully submits that the Court should not impose sanctions.

### A. <u>The Misstatements Were Inadvertent</u>

As the declarations demonstrate, the misstatements at issue were the result of human error. The Statement of Facts above describe the drafting process and demonstrate:

- The errors were not contained in the original draft prepared by Mr. Choudhary. Choudhary Dec. ¶ 7, Exhibit 1.
- Following revisions, the second draft did not contain the erroneous statements, but it introduced a typographical error: "Commerce disregards the de-dollarization of Turkish economy during July 2021 – August 2022, recognized *by in* [sic] the Canadian AD investigation on Turkish rebar." *Id.* ¶ 9, Exhibit 2 (emphasis added).
- Following further revisions, "Commerce" was inserted between "by" and "in"—apparently in an unsuccessful attempt to remedy the typographical error. *Id.* ¶ 10.

- Compounding this error, a corresponding revision was made to the final sentence of the paragraph, erroneously changing "*the* factual findings *of* the Canadian investigation" to "*Commerce's* factual findings *in* the Canadian investigation." Opening Brief at 25-26 (emphasis added); Choudhary Dec. ¶ 10; ECF 32 (final proof brief); ECF 34 (corrected proof brief); ECF 52 (final brief containing Appx numbers).

These errors are the result of innocent human error. The drafting history of the Opening Brief does not indicate any purposeful attempt at deception.

Indeed, as explained above, Commerce's lack of participation in the Canadian investigation was clearly conveyed in the AR1 proceeding and elsewhere in the Opening Brief. The fact that the correct information was included in the Opening Brief "negate[s] any problem that the misstatement in the brief may have created." *Kusan, Inc. v. Alpha Distributors, Inc.,* 693 F. Supp. 1372, 1376 (D. Conn. 1988) (denying sanctions where misstatement in brief was contradicted by accurate exhibits appended to complaint).

The Federal Circuit holds that isolated, inadvertent errors are generally not sanctionable—whether under Rule 11 or under the appellate court's similar authority under its rules. Accordingly, the Federal Circuit has held that, "[s]o far as we have been able to determine,

this court has not in the past exercised its authority to impose sanctions for 'inadvertent' violations of applicable court rules." *In re Violation of Rule 28(c)*, 388 F.3d at 1385 (declining to impose sanctions under appellate rules because court "accept[ed] counsel's representation that the violation of Rule 28(c) in this case was inadvertent"); *see also Retamal*, 439 F.3d at 1378 (reversing Rule 11 sanctions imposed *sua sponte* by USCIT because, while attorney's argument was objectively incorrect, it "was neither frivolous nor inappropriate"); *1-10 Indus. Assocs., LLC v. United States*, 528 F.3d 859, 870 (Fed. Cir. 2008) ("miscalculation of facts" does not "necessarily equate with breach of the duty of candor under [Rule 11]"); *Promptu Sys. Corp. v. Comcast Cable Commc'ns, LLC*, 92 F.4th 1384 (Fed. Cir. 2024) (declining to impose sanctions where court "accept[ed] this mistake was made in good faith by Appellee at the time of briefing" and that counsel "was unaware of" negative precedential decisions involving litigant's own law firm).

Courts in other jurisdictions similarly decline to impose sanctions to punish innocent human error. *See, e.g.*, *Kusan,* 693 F. Supp. at 1375 (declining sanctions where trademark owner misrepresented trademark registration as appearing on the principal, rather than the supplemental,

register since the "factual error appears completely inadvertent and did not mislead the court"); *Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co.*, 8 F.3d 441, 451 (7th Cir. 1993) ("Rule 11 is not directed to isolated factual errors that do not undermine a party's legal theory."); *Gray v. O'Malley,* Court No. 4:20-0574, 2024 WL 5046480, at *5 (W.D. Mo. Dec. 9, 2024) (declining to sanction attorney despite clear misstatement of current applicable law, since the court took "counsel at their word that they did not mean to mislead").

Viewed through this precedent, the GDLSK attorneys did not act objectively unreasonably under the circumstances. As the declarations demonstrate, the attorneys reviewed the relevant authority and—with the exception of the two inadvertent errors contained in a single paragraph—cited it correctly. *See generally*, Choudhary Dec.; Kahn Dec.; Marshak Dec. They subjected the Opening Brief to several rounds of review prior to submitting it. *Id.* Counsel's failure to notice two ministerial errors introduced late in the collaborative editing of a 69-page Opening Brief cannot be said to constitute "objectively unreasonable" conduct. Accordingly, the Court respectfully should decline to impose sanctions *sua sponte* under CIT Rule 11.

### B. Neither the Court Nor Opposing Counsel Was Misled By The Misstatements

Courts considering sanctions for misrepresentations made in court-filed papers have examined whether any party was actually misled by the erroneous statement. *See, e.g.*, *1-10 Indus. Assocs., LLC v. United States*, 528 F.3d 859, 870 (Fed. Cir. 2008) (misrepresentation to court is not sanctionable where "the court knew otherwise, [and] it could not have been misled as to the truth"); *Milwaukee Concrete Studios*, 8 F.3d 441 at 450 (sanctions inappropriate where defendant "was not confused by [Plaintiff's] error" and "no one was laboring under a misapprehension"); *compare Precision Specialty Metals*, 315 F.3d at 1350 (sanctions appropriate where attorney who distorted precedential opinions in fact "misled the court").

Significantly, neither the Court nor opposing counsel were, in fact, misled by the single erroneous paragraph on pages 25-26.

In its responsive briefing, Defendant addressed the argument that GDLSK made on page 31 of its Opening Brief and intended to make on pages 25-26: simply that Commerce's determinations were inconsistent with the findings of the Canadian government. On page 30 of its Response Brief, Defendant reiterated that Commerce would not consider

determinations from foreign authorities, particularly where those findings concerned a different product, record and legal framework. Defendant did not address GDLSK's mistaken statements that Commerce had participated in that foreign determination.

The Court likewise recognized GDLSK's errors immediately, labeling the statements so "outlandish" that they appeared to be "the product of hallucination." Show Cause Order at 2.

Since neither opposing counsel nor the Court were misled by GDLSK's erroneous statements, sanctions should not be imposed.

### C. GDLSK Acknowledged Its Errors As Soon As They Were Brought To Its Attention

Finally, courts considering sanctions often take into account whether the party acknowledged its mistake once alerted to it. *See, e.g.*, *Kusan*, 693 F. Supp. at 1376 (holding sanctions to be inappropriate where party "promptly filed a correction" once the "error was brought to [its] attention").

Here, Marshak, Kahn, and Choudhary acknowledged their errors the first time they realized they had made a mistake, *i.e.*, when they received this Court's Show Cause Order on September 22, 2026. This Response is GDLSK's first opportunity to address the incorrect phrasing.

GDLSK acknowledges its errors, apologizes, and will readily submit a corrected brief for the Court's docket.

**CONCLUSION**

For the foregoing reasons, Plaintiff and its counsel request that this Court not order sanctions.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

*599 Lexington Avenue., Fl. 36
New York, New York 10022
-and-
1201 New York Avenue, N.W.
Suite 650
Washington, D.C. 20005

*Counsel for Plaintiff Zhejiang Dingli Machinery Co., Ltd.*

Dated: October 6, 2026

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Judge Baker's document formatting requirements, the undersigned certifies that Plaintiffs' Response to Show Cause Order, filed on October 6, 2026, was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts – such as, but not limited to, Chat GPT or Google Bard.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
1201 New York Ave., NW,
Suite 650
Washington, DC 20005

*Counsel for Plaintiff Zhejiang Dingli Machinery Co., Ltd.*

Dated: October 6, 2026